[Cite as *In re C.W.*, 2010-Ohio-2157.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## WYANDOT COUNTY

IN THE MATTER OF:

C.W.,

CASE NO. 16-09-26

[MARY WARD,

**O P I N I O N**

MOTHER-APPELLANT].

**Appeal from Wyandot County Common Pleas Court
Juvenile Division
Trial Court No. C 2092020**

**Judgment Affirmed**

**Date of Decision:   May 17, 2010**

APPEARANCES:

   *Randy F. Hoffman*  for Appellant, Mary Ward

   *John Andrew Motter*  for Appellee, John Ward

   *Jonathan K. Miller* and *Douglas D. Rowland*  for Appellee,
      Wyandot Co. Dept. of Job and Family Services

**SHAW, J.**

{¶1} Mother-appellant, Mary Ward ("Mother"), appeals the December 16, 2009 judgment of the Common Pleas Court, Juvenile Division, of Wyandot County, Ohio, granting temporary custody of her child, C.W., to C.W.'s maternal aunt and uncle and providing the Wyandot County Department of Job and Family Services ("DJFS") with protective supervision of the child.

{¶2} On October 9, 2009, DJFS received information alleging that C.W., who was sixteen at that time, was being sexually abused by her father ("Father"). The agency and the local sheriff's department began investigating these allegations. When DJFS made contact with C.W., she was staying with her aunt and uncle. C.W. confirmed the allegations that her father sexually abused her for a number of years. She also reported that she told her mother what her father had been doing when he was incarcerated for another offense but that her mother allowed her father to return to their home upon his release from prison.

{¶3} At some point while C.W. was staying with her aunt and uncle, Mother came to the home and was upset with C.W. for coming forward about her father. C.W.'s aunt contacted the sheriff's department, which then informed DJFS of Mother's visit. Initially, DJFS was unable to contact Mother. The agency was able to speak with C.W.'s mother a few days later when she came back to the aunt's home and the sheriff's department was contacted again. Rodney Traxler of

DJFS spoke to the mother at the sheriff's department, and she signed a safety plan. This plan allowed C.W. to stay with her aunt until further notice, did not allow Mother to contact C.W. until further notice, and provided that Mother would initiate counseling for her family.

{¶4} Shortly after signing the safety plan, Mother advised DJFS that she did not agree with the plan and did not want to follow it. As a result of its investigation and Mother's unwillingness to follow the safety plan, DJFS filed a two-count complaint on October 16, 2009, in the juvenile court, alleging that C.W. was an abused and dependent child. That same day, a Court Appointed Special Advocate ("CASA") was appointed as C.W.'s guardian ad litem ("GAL"). On October 26, 2009, the initial hearing in this matter was held, and both parents requested court-appointed counsel, which was granted.[1] The court also appointed an attorney to represent C.W. In addition, DJFS informed the court that Mother did not object to C.W. remaining with her aunt until further orders of the court, and the trial court ordered that C.W. would continue to reside with her aunt.

{¶5} On November 13, 2009, DJFS filed a case plan, which was signed by a number of people, including Mother and C.W.'s aunt. This plan provided that C.W. would stay with her aunt, that Mother was willing to complete case plan services to enable C.W. to return home, and that regular supervised visitation

---

[1] C.W.'s father, John Ward, appeared at this hearing in the custody of the Wyandot County Sheriff's Department.

would occur. The plan largely provided for counseling services for C.W., Mother, and C.W.'s siblings, including family counseling to address the blame placed on C.W. for the father's absence. The plan also provided that visitation with C.W. and her siblings would occur when deemed appropriate by the therapist, that visitation may move to unsupervised visits with positive reports from service providers and reduction in safety threats, and that Mother would follow all recommendations made by the therapist.

{¶6} The adjudicatory hearing was held on November 19, 2009. Both Mother and Father admitted that C.W. was an abused and dependent child. However, Father did not admit that either he or Mother was the perpetrator of the abuse, and Mother did not admit that she was the perpetrator. In addition, Mother did not agree with C.W.'s current placement with the aunt. After reviewing the record and accepting the admissions of the parents, the trial court found by clear and convincing evidence that C.W. was an abused and dependent child and that DJFS made reasonable efforts to prevent the removal of C.W. The court also found that it was in C.W.'s best interest to remain in the temporary custody of her aunt, as a temporary placement, and that DJFS would continue to have protective supervision of C.W., who was now seventeen.

{¶7} On December 7, 2009, the dispositional hearing was held. DJFS presented the testimony of the on-going caseworker, April Allison, the

CASA/GAL assigned to C.W., Leona Feck, and Traxler. All three witnesses testified that C.W. should continue to reside with her aunt. No other witnesses were presented. However, counsel for each party, including counsel for C.W., was given the opportunity to present closing argument. At the conclusion of the hearing, the trial court found on the record that it was in C.W.'s best interest to continue her temporary placement with her aunt and that DJFS maintain protective supervision. The court also approved the case plan but stated that any references to Father's guilt should be removed from the plan because his guilt had not been proven.[2]

**{¶8}** The court filed its judgment entry reflecting its disposition on December 16, 2009. This appeal followed, and Mother now asserts three assignments of error.

### ASSIGNMENT OF ERROR I

**THE INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL AT THE DISPOSITION HEARING IN NOT CALLING WITNESSES OR CROSS EXAMINING TWO OF APPELLEE'S WITNESSES ALLOWED FOR ERROR IN THE PLACEMENT OF THE MINOR CHILD WITH THE MATERNAL AUNT AND UNCLE OF THE CHILD OVER THE APPELLANT'S PREVIOUSLY STATED OBJECTIONS.**

### ASSIGNMENT OF ERROR II

**THE TRIAL COURT ERRED IN PLACING THE MINOR CHILD WITH THE MATERNAL AUNT AND UNCLE OF**

---

[2] DJFS filed another case plan on December 9, 2009, deleting its prior reference to Father being the sexual perpetrator but leaving all other provisions in tact.

**THE CHILD AT DISPOSITION WHERE SUCH PLACEMENT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED.**

**ASSIGNMENT OF ERROR III**

**THE TRIAL COURT ERRED IN PLACING THE MINOR CHILD WITH THE MATERNAL AUNT AND UNCLE OF THE CHILD WHERE THE CASE PLAN PREPARED BY WYANDOT COUNTY JOB AND FAMILY SERVICES IS NOT DESIGNED TO WORK TOWARD THE REUNIFICATION OF THE MINOR CHILD WITH THE APPELLANT AND HER FAMILY.**

**{¶9}** For ease of discussion, we elect to address the assignments of error out of the order in which they appear.

*Second Assignment of Error*

**{¶10}** A juvenile court has broad discretion in the disposition of an abused neglected, or dependent child. See R.C. 2151.353(A) and Juv.R. 29(D). Included among the dispositional orders concerning an abused, neglected, or dependent child that a trial court may render are placement of the child in protective supervision and committing the child to the temporary custody of a public children services agency or a relative. R.C. 2151.353(A).

**{¶11}** In choosing among the alternatives, the best interest of the child is the court's primary consideration. *In re Hauenstein*, 3rd Dist. Nos. 5-03-38, 5-03-39, 2004-Ohio-2915, at ¶ 20; see, also, *In the Matter of Holtgreven* (June 23, 1995), 3rd Dist. No. 5-95-7, unreported, 1995 WL 368841, citing *In re Pieper*

*Children* (1993), 85 Ohio App.3d 318, 322, 619 N.E.2d 1059. Furthermore, in making its dispositional order, the court must consider which situation will best promote the "care, protection, and mental and physical development" of the child with the understanding that the court should separate a child from his family environment "only when necessary for the child's welfare or in the interests of public safety." R.C. 2151.01(A). However, a reviewing court will not reverse the trial court's decision at this dispositional stage as being against the manifest weight of the evidence if it is supported by competent and credible evidence. *Holtgreven*, supra, citing *C.E. Morris Co. V. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, syllabus, 376 N.E.2d 578.

{¶12} In this case, the evidence revealed that C.W. reported that her father had sexual intercourse repeatedly with her since she was approximately age eleven. In addition, C.W. reported that her father had been incarcerated at one point and that she told her mother about the sexual abuse while her father was in prison. Nevertheless, according to C.W.'s report, Mother allowed Father to return to their home upon his release. In addition, Traxler testified that Mother admitted to him that C.W. told her at one time that Father was engaging in sexual activity with her but that C.W. did not mention it again so Mother dismissed it. C.W. reported that the abuse happened so often that she estimated having sexual intercourse with her father approximately 150 times. Yet, when DJFS and law

enforcement were made aware of these allegations, Mother and C.W.'s siblings aligned themselves with Father and blamed C.W. for Father's absence.

{¶13} The CASA/GAL testified[3] that C.W. informed her that the visits with her mother were not going well because her mother yelled at her frequently, cried a lot, and tried to make C.W. feel guilty. The caseworker testified that C.W.'s siblings were spreading rumors about her and antagonizing her at school and that C.W. did not like her old school because of this. The caseworker also expressed concern when questioned about C.W. being placed with her maternal grandparents that it is only a short distance from Mother's home, Mother visits there frequently, including when C.W. was there with her aunt despite the fact the caseworker asked Mother not to visit her parents when C.W. is there, and that C.W. has received negativity about the current situation from them as well.

{¶14} As for the home of C.W.'s aunt, the evidence revealed that C.W. was very comfortable in her aunt's home. Her aunt had also taken measures to accommodate C.W. living with her and her family of five. For instance, although the aunt's home consists of two bedrooms, the aunt and uncle gave C.W. their bedroom and have been utilizing a couch and/or futon in the living room while they are sleeping. This arrangement has been manageable because both the aunt

---

[3] The CASA assigned to C.W.'s case as GAL was Louanne Hufford. However, at the dispositional hearing, Leona Feck testified as the GAL. Feck was a CASA trainee who shadowed Hufford on C.W.'s case. However, Feck testified that she personally spoke with C.W. on multiple occasions and made many observations of her own.

and uncle work third shift. They are also in the process of looking for a bigger home. The caseworker further testified that while the home may be a "tight fit," there is adequate room, food, clothing, and shelter with the aunt. In addition, C.W. is very close to her aunt and uncle, is very much a sister to her cousins, and they have been involved with C.W. for a long period of time. Moreover, before the allegations of sexual abuse were made, C.W. often stayed with her aunt and uncle, "residing on and off there for years" and staying with them on weekends and during the summers. C.W.'s aunt takes her to all medical appointments and counseling appointments. She also has set rules to follow while living in the aunt's home, and C.W. obeys them. Further, the aunt and uncle are supportive of C.W., and she feels comfortable and stable in their home.

{¶15} The testimony also revealed that C.W. wanted to stay with her aunt and uncle. She enjoyed her new school, which was free of any ridicule from her siblings, and living with her aunt was her "comfort zone." The CASA/GAL was also concerned that removing C.W. from her aunt's home and putting her in a different place would not be beneficial to her mental health and would likely cause more problems. Further, during closing argument, C.W.'s attorney informed the court that C.W. did not want to return to her mother's home, that she does not feel comfortable there, that she did not want to live with her maternal grandparents either because they lived in close proximity to her mother's home and her mother

and siblings frequently visit there, and that she had no desire to be in a foster home.  C.W.'s attorney also stated that C.W. feels safe and protected in her aunt's home and that her aunt cares for her deeply and would do anything to protect her.

**{¶16}** Given all of the aforementioned evidence and the recommendation of all three witnesses that C.W. remain in her aunt's home, as well as the representations made by counsel for C.W., we do not find that the trial court erred in finding that it was in C.W.'s best interest to remain in her temporary placement with her aunt.  The court noted that it was concerned about the negativity directed towards C.W. by her siblings and Mother.  The court also noted that Mother and Father had no issues with allowing C.W. to frequently stay in the aunt and uncle's home before the allegations of sexual abuse and that nothing in the record indicated that anything had changed or would change in the home regarding their protection, attitude, or care for C.W.  In addition, the court found that C.W. was comfortable at her new school and that it did not "carry with it the baggage the old school did[.]"  Each of these findings and the decision to keep C.W. in her current placement were supported by competent and credible evidence.  Therefore, the second assignment of error is overruled.

*Third Assignment of Error*

**{¶17}** In her third assignment of error, Mother contends that the trial court erred in placing C.W. with her aunt because the case plan prepared by DJFS was

not designed to work toward reunification. In support of this contention, Mother asserts that the caseworker's testimony clearly indicated that no other placement is being considered and that C.W.'s age renders the court's disposition a "*de facto* permanent custody*" as there is not sufficient time to work through the case plan requirements because C.W. will turn eighteen in October, 2010.

{¶18} The Revised Code requires that a children services agency prepare and maintain a case plan for any child to whom the agency is providing services and to whom the agency filed a complaint alleging that the child is an abused, neglected, or dependent child. R.C. 2151.412(A)(1). This case plan is to be filed with the court prior to the adjudicatory hearing but no later than thirty days after the earlier of the date on which the complaint is filed or the child was first placed into shelter care. R.C. 2151.412(C). The agency is also required to attempt to obtain an agreement among all parties, including the parents regarding the content of the case plan, and the court is required to journalize the case plan as part of its dispositional order if all parties agree to the content and the court approves it. R.C. 2151.412(D). All case plans for children in temporary custody must have certain general goals, including "[c]onsistent with the best interest and special needs of the child, to achieve a safe out-of-home placement in the least restrictive, most family-like setting available and in close proximity to the home from which the child was removed" and "[t]o eliminate with all due speed the need for the out-

of-home placement so that the child can safely return home." R.C. 2151.412(F)(1)(a-b).

{¶19} In the case sub judice, the case plan for C.W. was filed within the required time period and was signed by Mother. C.W.'s mental well-being was a large part of the concerns provided in this case plan, particularly the detrimental impact the abuse had on her and the way her family reacted towards her once she revealed this abuse. Thus, the majority of services were directed at helping C.W., her mother, and her siblings deal with C.W.'s revelations of sexual abuse perpetrated upon her and the upheaval in the family because of these revelations. More specifically, the case plan called for counseling for C.W., her mother, and her siblings. It also addressed the need for family counseling to learn coping skills and ways to not blame C.W. for the events that happened in the home. The plan further provided supervised visitation between C.W. and her mother but that visitation could possibly change to unsupervised visits if the service providers gave positive reports and there was a reduction in threats to C.W.'s safety. It also provided for visitation with her siblings when deemed appropriate by the therapist.

{¶20} Although Mother asserts that the caseworker's testimony demonstrated that DJFS was not considering any other placement, including reunifying C.W. with Mother, a review of the testimony does not support this conclusion. The caseworker testified that she had not explored using Mother or

anyone other than the aunt and uncle as a caretaker for C.W. for purposes of the dispositional hearing, specifically stating that Mother was not being considered as a placement option *at this time*. She never testified that returning C.W. to her mother's home was not a possibility in the future. Rather, at the time of the dispositional hearing, Father was incarcerated, Mother and C.W.'s siblings blamed C.W. for his absence, and C.W.'s visits with Mother involved Mother crying, yelling, and attempting to make C.W. feel guilty. Further, C.W.'s siblings spread rumors about her, causing her not to like going to the school she attended while living with her mother. Therefore, returning to Mother's home under the circumstances as they existed at the time of disposition was not in C.W.'s best interest. However, the case plan was designed to address these issues with the goal being to change the behavior of Mother and C.W.'s siblings towards C.W. so that she could safely return home and not feel guilty for reporting the abuse she endured.

{¶21} As for the fact that C.W. is seventeen, we do not find that the placement of C.W. with her aunt and uncle results in a *de facto* grant of permanent custody. To the contrary, whether Mother accomplishes the goals set forth in the case plan before C.W. turns eighteen is entirely up to her. This is a matter of not blaming C.W. for the predicament in which the family finds itself, not attempting to make her feel guilty, and supporting her through the counseling she needs to

handle the emotional toll that the sexual abuse perpetrated against her caused. These are issues that the mother and siblings have, and it is not unreasonable to expect that their attitudes and behaviors change before C.W., who has been a victim of significant sexual abuse over a long period of time, is able to return to that home.

{¶22} In light of the evidence, we find that the case plan was adequately designed to accomplish its required goals of 1) a safe out-of-home placement in the least restrictive, most family-like setting available and 2) reunification with her mother. Furthermore, Mother agreed to this plan when she signed it, and the only concerns she stated were that Father was identified as the perpetrator, that the abuse was alleged to have occurred in her home, and that C.W. was being placed with the aunt. Accordingly, we do not find that the trial court erred in adopting the case plan provided by DJFS or in placing C.W. with her aunt and uncle, which was the least restrictive, most family-like setting available. Therefore, the third assignment of error is overruled.

*First Assignment of Error*

{¶23} Mother asserts in her first assignment of error that she was denied the effective assistance of counsel. Specifically, Mother contends that her trial counsel was ineffective because he failed to present any evidence on her behalf at the dispositional hearing, including calling her as a witness and offering

alternatives to placement with the aunt and uncle, and failed to cross-examine two of the three witnesses called by DJFS to demonstrate that placement with the aunt was not appropriate.

{¶24} The Supreme Court of Ohio has adopted a two-part test for determining claims of ineffective assistance of counsel in criminal prosecutions. *State v. Bradley* (1989), 42 Ohio St.3d 136, paragraph two of the syllabus, 538 N.E.2d 373, citing *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052. This standard two-part test for establishing ineffective assistance of counsel also applies to permanent custody proceedings. *In re Shores*, 3rd Dist. No. 1-07-16, 1-07-17, 2007 -Ohio- 5193, at ¶ 17, citing *In re T.P.*, 2nd Dist. No. 20604, 2004-Ohio-5835.

{¶25} An ineffective assistance of counsel claim requires proof that trial counsel's performance fell below objective standards of reasonable representation and that the defendant was prejudiced as a result. *Bradley*, 42 Ohio St.3d at paragraph two of the syllabus, 538 N.E.2d 373. As to the first prong of the test, counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675, 693 N.E.2d 267, 1998-Ohio-343. Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965, 1995-Ohio-104. Rather, the errors

complained of must amount to a substantial violation of counsel's essential duties to his client. See *Bradley*, 42 Ohio St.3d at 141-142, 538 N.E.2d 373, quoting *State v. Lytle* (1976), 48 Ohio St.2d 391, 396, 358 N.E.2d 623, imposition of death penalty vacated by *Lytle v. Ohio* (1978), 438 U.S. 910, 98 S.Ct. 3135 (holding Ohio's death penalty scheme in effect at the time was unconstitutional).

**{¶26}** Regarding the second prong of prejudice, a defendant must prove that there exists a reasonable probability that, but for counsel's errors, the outcome at trial would have been different. *Id*. at paragraph three of the syllabus. "Reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. *Id*. at 142.

**{¶27}** An attorney's decision not to cross-examine a witness falls within the category of tactical or strategic trial decisions. *State v. Pasqualone*, 121 Ohio St.3d 186, 903 N.E.2d 270, 2009-Ohio-315, at ¶ 31. "An appellate court reviewing an ineffective assistance of counsel claim must not scrutinize trial counsel's strategic decision to engage, or not engage, in a particular line of questioning on cross-examination." *In re Brooks*, 10th Dist. Nos. 04AP-164, 04AP-165, 04AP-201, 2004-Ohio 3887, at ¶ 40, citing *State v. Revels*, 12th Dist. Nos. CA2001-09-223, CA2001-09-230, 2002-Ohio-4231, at ¶ 28; see, also, *Pasqualone*, supra.

{¶28} Mother's attorney elected not to cross-examine the CASA/GAL or Traxler. This decision constitutes a tactical or strategic trial decision. As noted, such a decision enjoys a strong presumption of reasonableness, which Mother must overcome to prevail on her claim of ineffective assistance.

{¶29} Our review of the record reveals that the trial court followed an order of examination whereby Father's attorney was the first attorney afforded the opportunity to cross-examine each witness. Father's attorney asked a number of questions of these two witnesses and the caseworker about placement of C.W., including alternatives to placement with the aunt. Also, Mother's trial counsel raised these issues in his cross-examination of the caseworker. Thus, many of the concerns now raised by Mother were brought out in the cross-examinations conducted by Father's attorney and/or her attorney's cross-examination of the caseworker. Moreover, Mother has failed to demonstrate that cross-examination of these two witnesses by her attorney would have resulted in a different outcome. Therefore, we do not find that the decision not to cross-examine these two witnesses amounted to ineffective assistance of counsel.

{¶30} As for counsel's decision not to call Mother as a witness or present any other evidence, this also falls within the realm of trial strategy. See *State v. Treesh*, 90 Ohio St.3d 460, 490, 739 N.E.2d 749, 2001-Ohio-4. Thus, it, too, enjoys a strong presumption of reasonableness, which Mother must overcome to

prevail on her claim of ineffective assistance. Mother has not presented any argument as to what her testimony would have been, what other evidence there was to present, or how the outcome of the proceeding would have been different if she had testified or other evidence had been presented. Thus, we cannot find that this decision resulted in ineffective assistance of counsel either. Accordingly, the first assignment of error is overruled.

{¶31} For all of these reasons, the judgment of the Common Pleas Court, Juvenile Division, of Wyandot County, Ohio, is affirmed.

*Judgment Affirmed*

**WILLAMOWSKI, P.J., and PRESTON, J., concur.**

**/jlr**