[Cite as *In re L.C.*, 2011-Ohio-2066.]

IN THE COURT OF APPEALS FOR CLARK COUNTY, OHIO

IN RE: L.C. and L.C.-B.                    :

                                           :        C.A. CASE NO.     2010 CA 90

                                           :        T.C. NO.     20081324
                                                                  20081325
                                           :
                                                    (Civil appeal from Common
                                           :         Pleas    Court,    Juvenile
                                                    Division)

                                           :

                                  . . . . . . . . . .

                         **O P I N I O N**

                Rendered on the ___29th___ day of ___April___, 2011.

                                  . . . . . . . . . .

ANDREW R. PICEK, Atty. Reg. No. 0082121, Assistant Prosecuting Attorney, 50 E. Columbia Street, 4th Floor, P. O. Box 1608, Springfield, Ohio 45501
          Attorney for Plaintiff-Appellee

BRANDIN D. MARLOW, Atty. Reg. No. 0076381, 150 N. Limestone Street, Suite 218, Springfield, Ohio 45501
          Attorney for Defendant-Appellant

                                  . . . . . . . . . .

FROELICH, J.

          **{¶ 1}** Mother appeals from judgments of the Clark County Court of Common

Pleas, Domestic Relations Division, Juvenile Section, which granted permanent custody of

her daughter, L.C.-B., to Clark County Department of Job and Family Services ("CCDJFS")

and granted legal custody of her daughter, L.C., to L.C.'s paternal grandparents. For the following reasons, the judgments of the trial court will be affirmed.

{¶ 2} In July 2008, CCDJFS filed complaints for temporary shelter care with respect to L.C.-B., age nine months, and her sister, L.C., age 5, due to "uninhabitable" conditions at their home. The complaints described a "strong stench of ammonia" from cat urine that could be smelled from the street and cat feces "throughout the home imbedded in carpet, on beds, in crib, on cabinets, in bathtub, covering kitchen floor, and overflowing in boxes throughout the attached garage." L.C. was covered with "mosquito-like bites" and her eyes were swollen shut, a possible allergic reaction to the cats. "10 plus" cats were removed from the house, "with some remaining in the walls and crawl spaces." The complaints noted that one of the family's previous residences had also been deemed uninhabitable by the health department. Additionally, the complaint alleged that the children had not been fed for several hours and L.C.-B.'s diaper had not been changed, nor were there any diapers in the house. There were no shoes for the children in the house. L.C.-B. was "behind on shots and ha[d] an ear infection." L.C. "desperately need[ed] speech evaluation [with] possible therapy and [to] have her ears checked."

{¶ 3} The trial court found the children to be dependent pursuant to R.C. 2151.04(C) and granted temporary custody to CCDJFS; the children were placed in foster care, and case plans were developed for the parents. Throughout the proceedings, the girls' fathers attested to their unwillingness and/or inability to care for their daughters, and neither man sought to obtain custody.

{¶ 4} While L.C. and L.C.-B. were in the temporary custody of CCDJFS, the

maternal grandparents filed a motion for custody of both girls. In July 2009, CCDJFS filed a complaint and motion to modify temporary custody to permanent custody for both children on the basis that it was "now in the child[ren]'s best interest" to grant permanent custody, because reasonable efforts to reunite the children and parents had been made. While these motions were pending, L.C.'s paternal grandparents filed a motion for custody of L.C. In the fall of 2009, CCDJFS asked the court to terminate temporary custody of L.C. and to grant her paternal grandparents' motion for legal custody.

{¶ 5} After a hearing, the trial court denied CCDJFS's motions regarding custody of the children. The court found that the mother had "substantially completed" her case plan and that CCDJFS had "failed to prove by a preponderance of the evidence that the mother was unable to meet the needs of the children, now or anytime in the future." The court also denied the paternal grandparents' motion for custody of L.C. and the maternal grandparents' motion for custody of both girls. The court put in place a plan and conditions for the transfer of the children to their mother's custody.

{¶ 6} Two weeks later, CCDJFS filed a motion for a new trial, claiming that new evidence had come to light since the trial court's judgment which was relevant to its decision to terminate temporary custody and to return the children to their mother's home. Specifically, the motion claimed that Mother had been terminated from her job for poor performance and had lied to her caseworker about this fact, had been reluctant to exercise visitation with the girls, and had failed to provide a safe home environment in the weeks since the trial court's order. In response, the trial court amended its previous order and extended CCDJFS's temporary custody. The court conducted another hearing in August

2010.

{¶ 7} After the hearing, the trial court concluded that Mother "struggles mightily to meet her own needs" and "acts childish and depends upon others for her support and care." It noted the psychologist's view that she was "poorly equipped" to care for her children or even to identify their needs and showed "clear difficulty with basic judgment and problem solving skills." The court also concluded that Mother had been untruthful with the service providers and people involved in the lives of her children. In sum, the trial court concluded that, "[i]n spite of her affection for her children and her occasional appropriate interaction with the children, [Mother] has failed to demonstrate that she is able to meet their basic needs for the long term. She has failed to convince the Court that she can meet the financial, emotional, academic, or material needs of the children, now or at any time in the near future."[1] The trial court granted CCDJFS's motion for permanent custody of L.C.B. and granted L.C.'s paternal grandparents' motion for legal custody.

{¶ 8} Mother appeals, raising one assignment of error.

{¶ 9} Mother's assignment of error states:

{¶ 10} "THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FAILED TO CONSIDER L.C.-B.'S AND L.C.'S RELATIONSHIP WITH THEIR MATERNAL

---

[1] The language of the trial court's judgment could be read to imply that Mother had the burden to prove her fitness as a parent. As we discuss below, CCDJFS had the burden to prove that an award of permanent custody to CCDJFS or of legal custody to a relative was in the children's best interest. Mother does not argue that the trial court applied the improper standard, and there was clear and convincing evidence to support the trial court's ultimate conclusion that granting CCDJFS's motions served the children's best interest.

GRANDPARENTS AS PART OF ITS R.C. §2151.414(D)(1)(A) DETERMINATION."[2]

{¶ 11} Mother does not challenge the court's decision that she, herself, could not parent the children. Mother only challenges the court's judgment to the extent that it did not sufficiently consider the girls' relationships with their maternal grandparents. In its analysis of the best interest of the children, the trial court listed, as one factor in support of its decision, that L.C. and L.C.-B. "had no meaningful contact with [their] biological family." Mother claims that this statement was contrary to the evidence.

{¶ 12} The United States Supreme Court has recognized that parents' interest in the care, custody, and control of their children "is perhaps the oldest of the fundamental liberty interests recognized" by the court. *Troxel v. Granville* (2000), 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49. Parents who are suitable persons have a "paramount" right to the custody of their minor children. *In re Perales* (1977), 52 Ohio St.2d 89, 97.

{¶ 13} A juvenile court has broad discretion in the disposition of an abused, neglected, or dependent child. See R.C. 2151.353(A) and Juv.R. 29(D). Included among the dispositional orders concerning an abused, neglected, or dependent child that a trial court may render are committing the child to the permanent custody of a public children services agency or awarding legal custody to a relative or any other person. R.C. 2151.353(A). "In choosing among the alternatives, the best interest of the child is the court's primary consideration. Furthermore, in making its dispositional order, the court must consider which situation will best promote the 'care, protection, and mental and physical

---

[2]The assignment of error is stated three times in Mother's brief. Twice, it refers only to L.C.-B.; the third time, it refers to both girls. We will address the argument with respect to both girls.

development' of the child with the understanding that the court should separate a child from his family environment 'only when necessary for the child's welfare or in the interests of public safety.' R.C. 2151.01(A)." *In re C.W.*, Wyandott App. No. 16-09-26, 2010-Ohio-2157, ¶11 (internal citations omitted)

{¶ 14} In a proceeding for the termination of parental rights, all the court's findings must be supported by clear and convincing evidence. R.C. 2151.414(B)(1); *In re J.R.*, Montgomery App. No. 21749, 2007-Ohio-186, ¶9. The children services agency has the burden of proof. *In re K.W.*, Montgomery App. No. 23407, 2010-Ohio-29, ¶31. However, the court's decision to terminate parental rights will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established. *In re Forrest S.* (1995), 102 Ohio App.3d 338, 344-345. We review the trial court's judgment for an abuse of discretion. See *In re C.F.,* 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 48 (applying the abuse of discretion standard to trial court's findings under R.C. 2151.414).

{¶ 15} R.C. 2151.414(D) directs the trial court to consider all relevant factors when determining the best interest of the child, including but not limited to "(1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers, out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child, ***; [and] (4) the child's need for a legally secure permanent placement and whether that

type of placement can be achieved without a grant of permanent custody to the agency."

{¶ 16} Consideration of placement of a child with a relative is not a statutory requirement. *In re F.C.*, Montgomery App. No. 23803, 2010-Ohio-3113, ¶24. "That possibility is a matter that ought to be considered in connection with the child's interaction and relationship with the child's parents, relatives, foster caregivers, out-of-home providers, and any other person who may significantly affect the child." Id., citing R.C. 2151.414(D)(1)(a) and *In re C.W.*, Montgomery App. No. 20140, 2004-Ohio-2040.

{¶ 17} Mother relies on the following testimony in support of her argument. Her father, Maternal Grandfather, testified that he and his wife had visited with L.C. and L.C.-B. or babysat them almost every day before they were removed from Mother's custody.[3] Maternal Grandmother testified that, after the children had been removed from Mother's home in July 2008, they saw the children for the first time in March of 2009, for L.C.'s birthday; they eventually got "visitation every other week for two hours" at Gibault Visitation. Maternal Grandmother further testified that, from February to the time of the hearing, they had seen the girls "[w]hen [Mother] gets them, we get to see them between one and two hours on a Saturday."

{¶ 18} The guardian ad litem's reports contained additional information about the maternal grandparents, because they expressed an interest in custody of the girls. The guardian ad litem stated that Mother had been living with Maternal Grandmother at the time of the children's removal and that the cats in the home had belonged to Maternal

---

[3] In her brief, Mother states that the maternal grandparents visited with the children "on an almost-weekly basis" prior to their removal, but, on the transcript page cited by Mother, Maternal Grandfather testified that they saw the children almost daily.

Grandmother. The maternal grandparents had divorced in 2002 but had moved back in together since the removal of the children. Mother also lived with them. When asked "if they were back together, [Maternal Grandfather] stated that he tolerates her [Maternal Grandmother]. [Maternal Grandmother] stated that they get along better since he quit drinking; she reports that he was a recovering alcoholic."

{¶ 19} The guardian ad litem also reported that, when a case worker did a surprise home visit to the maternal grandparents' house one afternoon, Maternal Grandfather was drinking a beer, and there were at least three cats living in the home. Maternal Grandfather had been "involved with Children's services" regarding a now-adult daughter from a prior marriage. The maternal grandparents had visited L.C. and L.C.-B. at Gibault Visitation, but "had some problems with following the rules" and had not followed through with the psychologist's recommendations that Maternal Grandmother get outpatient mental health counseling and that Maternal Grandfather "enter a substance abuse treatment." Maternal Grandfather reported drinking 24 beers per day for several years, but claimed that he had been drinking non-alcoholic beer in the last three years. Maternal Grandfather had been charged with domestic violence in 2002, but had been convicted of disorderly conduct. Maternal Grandmother had a 2003 domestic violence conviction.

{¶ 20} With respect to the girls' placements through CCDJFS, the guardian ad litem found that L.C.-B. was making "great progress" with her developmental delays while in foster care and that her foster mother was dedicated to her care. The guardian ad litem recommended that the trial court award permanent custody of L.C.-B to CCDJFS.

{¶ 21} The psychologist who evaluated the maternal grandparents found that

Maternal Grandfather was manipulated by his daughter and granddaughter into "compromising on the standards and expectations that he recognizes are appropriate," thereby placing the grandchildren at risk, and that Maternal Grandmother "offered excuses and explanations for behaviors that were blatantly inappropriate."

{¶ 22} The trial court concluded that L.C.-B. would "benefit greatly from a permanent, secure home," which neither parent was able to provide; it granted permanent custody of L.C.-B. to CCDJFS.

{¶ 23} As to the parental grandparents, the guardian ad litem stated that L.C.'s paternal grandparents sought custody of her and had been visiting with her regularly, including in home visits, with "no problems with the rules." L.C.'s paternal grandparents already had custody of two of their other grandchildren. The guardian ad litem recommended that the trial court grant legal custody of L.C. to her paternal grandparents. The court concluded that L.C. was attached to and at ease with her paternal grandparents, who had demonstrated their ability to provide love and appropriate care for her; it granted the motions that legal custody of L.C. be awarded to the paternal grandparents.

{¶ 24} The trial court did not discuss in detail its findings regarding the maternal grandparents, and it was not required to do so. But there was evidence in the record to support the trial court's conclusion that the girls did not have a relationship with them that was entitled to significant weight in the best interest determination and that there was "no safe, appropriate, harmonious and loving relationship" with the maternal grandparents. The maternal grandparents admitted that they had not been the girls' caregivers when Mother was unable to care for them and that, since the girls had been removed from Mother's

custody two years earlier, they saw the girls only when Mother had visitation. Maternal Grandmother admitted that they had gone significant periods of time without seeing the children while they were not in Mother's custody, and Maternal Grandfather testified that, when the children were returned to Mother's custody, he saw them once or twice a week and the visits were "[g]enerally not long."

{¶ 25} The trial court concluded that no one in Mother's extended family, including the maternal grandparents, had a safe, appropriate, harmonious, and loving relationship with the children and that their best interest would be served by removing them from the "birth" family. The trial court acted within its discretion in reaching this conclusion.

{¶ 26} Even if the evidence had established a strong bond between the girls and their maternal grandparents (which it did not), this factor would have been only one of many factors informing the trial court's discretion regarding the girls' best interest. Other factors, including the likelihood of placement in a permanent, secure home, the failure of the mother to remedy the concerns that caused the removal of the children, the child's wishes, as expressed to the guardian ad litem, and the guardian ad litem's recommendations, including her significant concerns about placement with the maternal grandparents, weighed heavily in favor of finding that the girls' best interest would be served by granting permanent custody of L.C.-B. to CCDJFS and legal custody of L.C. to her paternal grandparents.

{¶ 27} The trial court did not give inadequate consideration to the maternal grandparents' relationship with the children before awarding custody to CCDJFS and the paternal grandparents.

{¶ 28} The assignment of error is overruled.

**{¶ 29}** The judgment of the trial court will be affirmed.

. . . . . . . . . .

FAIN, J. and DONOVAN, J., concur.

Copies mailed to:

Andrew R. Picek
Brandin D. Marlow
Hon. Joseph N. Monnin