[Cite as *In re V.D.*, 2022-Ohio-1877.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

IN RE: V.D.

:
:
:
:
:
:
:
:
:
:
:
:

Appellate Case No. 29366

Trial Court Case No. G-2021-1453-0A, 0B

(Appeal from Common Pleas Court – Juvenile Division)

. . . . . . . . . . .

O P I N I O N

Rendered on the 3rd day of June, 2022.

. . . . . . . . . . .

MATHIAS H. HECK, JR. by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
 Attorney for Plaintiff-Appellee, MCCS

ALANA VAN GUNDY, Atty. Reg. No. 0100651, P.O. Box 245, Bellbrook, Ohio 45305
 Attorney for Defendant-Appellant, Mother

. . . . . . . . . . . . .

LEWIS, J.

{¶ 1} Defendant-Appellant H.C. (Mother), mother of V.D.,[1] a minor child, appeals from an order of the Montgomery County Common Pleas Court, Juvenile Division, granting temporary custody of V.D. to Montgomery County Children Services ("MCCS").

I.      Facts and Course of Proceedings

{¶ 2} On April 6, 2021, Deja Williams, a case worker for MCCS, filed a complaint alleging that V.D. was a neglected child pursuant to R.C. 2151.03(A)(2), (3), and (6) and a dependent child pursuant to R.C. 2151.04(B).   According to the complaint, MCCS received a referral in April 2020 when Mother followed J.D., V.D.'s father (Father), outside with a butcher knife and Mother knocked V.D. to the ground as the child chased after Father.   Then, in June 2020, MCCS received a second referral that stated concerns regarding the child's development and cleanliness.   The complaint alleged a case worker for MCCS had met with V.D. and Mother in June 2020; the case worker observed V.D. to have developmental delays and reported concerns for Mother's mental health.   Mother subsequently called the Dayton Police to report that she had observed her ex-boyfriend molest V.D.   The complaint also alleged that MCCS had a history with Mother, which included concerns for untreated mental health, parenting education, and substance abuse.   The complaint noted that Mother had moved to Maryland in July 2020 and that V.D. had been in the care of MCCS since a June 16, 2020 Interim Custody Decision.

{¶ 3} A hearing on adjudication was held before a magistrate on June 8, 2021. The following individuals testified at the hearing:   Stacey Jones, the intake case worker at

---

[1] In order to protect the identity of a minor child, we will refer to the child and his parents by their respective initials.

MCCS when Mother was referred to MCCS in April 2020; Dayton Police Officer James Gallagher; Jeremy Sturgill, a physician's assistant at Five Rivers Health Centers; Deja Williams, an ongoing case worker at MCCS; Mother; and K.C., the maternal grandmother of V.D.

{¶ 4} Jones testified that MCCS received a referral involving V.D in April 2020 based on an allegation of domestic violence involving Mother's chasing Father with a butcher knife and V.D.'s being knocked to the ground during the chase. June 8, 2021 Hearing Tr. p. 69-70. During April and May, Jones made several unsuccessful attempts to contact Mother. *Id.* at 71. MCCS received two additional referrals relating to V.D. and his family involving his developmental delays and how dirty V.D. was. *Id.* at 72, 74. During an in-person visit in June 2020, when V.D. was approximately 18 months old, Jones observed V.D.'s inability to sit up on his own or grasp things or talk. *Id.* at 76. MCCS received temporary custody of V.D. in June 2020. *Id.* at 79. According to Jones, Mother thought V.D.'s development was normal and that MCCS was out to get her. *Id.* at 80-81, 83. Mother moved to Maryland while V.D. was in MCCS's custody. While in Maryland, she placed a call to Jones and explained to him that she was lost in the woods. With the help of Jones and the Maryland police, Mother was safely located. *Id.* at 93-95.

{¶ 5} Deja Williams took over for Jones in August 2020 as the ongoing case worker. *Id.* at 154. Although Williams tried unsuccessfully to contact Mother in August, they began corresponding by email in September. Mother was provided with a copy of her case plan on several occasions. *Id.* at 155-156, 180-81, 184. Mother made it clear that she did not have any interest in moving back to Ohio, so Williams provided Mother

with community resource information for Maryland. *Id.* at 156-158. Mother did not start cooperating with MCCS until December 2020, at which time she began having weekly video chats with V.D. *Id.* at 159, 162. Mother provided a pay stub and a copy of her lease. *Id.* at 164. As of February 2021, Mother was not yet involved with the services that were a part of her case plan objectives. *Id.* at 166. Further, Mother had not signed the necessary releases of information for medical access. *Id.* at 194. Williams testified that V.D. was doing well in foster care as his body strength increased, he began babbling, and he was feeding himself. *Id.* at 170. At the time of the hearing, V.D. was involved with occupational therapy, physical therapy, and speech therapy. *Id.* at 173.

{¶ 6} Williams made several searches for Father but was unable to make contact with him until February 2021. Father attended a March 2021 video call with V.D. and acted appropriately during that call. *Id.* at 176-178.

{¶ 7} Jeremy Sturgill, a physician's assistant in Pediatrics and Internal Medicine at Five Rivers Health Centers, testified about his examinations of V.D. During an evaluation when V.D. was six months old, Sturgill set up a plan of care to address the fact that V.D. was not sitting up well, had a flattening on the back of his head, and was behind in immunizations. *Id.* at 141-144. He also noted that V.D. had gross motor delay. *Id.* at 152. Mother did not bring V.D. in for any follow-up appointments with Sturgill after that visit. *Id.* at 146.

{¶ 8} Mother testified that there was no truth to the allegation that she had chased Father with a butcher knife or that V.D. had been knocked to the ground. *Id.* at 198. She explained that V.D. was bathed every day and he was talking gibberish while in

Mother's care and could hold a cup. *Id.* at 199-200. Although Mother conceded she missed a couple of medical check-ups for V.D., she explained that this was due to her having surgery. While she was recovering from her surgery, a home nurse assisted with caring for V.D. *Id.* at 202-203, 238-239. Mother stated that she had received e-mails from Williams but did not receive any case plan. According to Mother, she was attending walk-in mental health treatments in Maryland and had a stable job and stable housing. *Id.* at 207-208, 210, 212, 243. K.C., the maternal grandmother, testified that V.D. had been clean and Mother had not been using drugs when K.C. visited with V.D. and Mother in October 2019. *Id.* at 255-257, 260.

{¶ 9} Following the June 8, 2021 hearing, the magistrate issued an interim order adjudicating V.D. a dependent and neglected child. On June 25, 2021, a hearing on disposition was held before the magistrate. Deja Williams, Mother, and Father testified at the hearing.

{¶ 10} Williams testified that V.D. had been in the custody of MCCS since June 2020, was then involved in multiple therapies, and had been diagnosed with autism. June 25, 2021 Hearing Tr., p. 271-273. Williams laid out the case plan objectives for both Mother and Father. *Id.* at 278-279, 294. She testified that she had tried to talk about the objectives with Mother, but Mother did not agree with the case plan and did not like to talk about it. *Id.* at 292-293. Neither Mother nor Father had met their case plan objectives. *Id.* at 279-287, 303-308. Mother did not provide Williams with recent income verification or mental health treatment verification. *Id.* at 299, 301-302. Usually, Mother acted appropriately on her video calls with V.D. However, one call had to be

ended because Mother talked negatively about V.D.'s foster parents. *Id.* at 310-312. Also, during one in-person meeting, a sheriff was called because Mother was inappropriate with the staff. *Id.* at 312-313. Mother had made an allegation that V.D. was being sexually abused by his foster parents. However, Mother failed to provide any details when Williams asked her about this allegation. Williams investigated Mother's claim but did not find any evidence of abuse. *Id.* at 318-320, 334-338.

**{¶ 11}** Mother testified that Williams's testimony was untrue in several respects. *Id.* at 342-346. According to Mother, Williams had not made much of an effort to help her with her case plan and had not followed up adequately regarding Mother's allegations of abuse by the foster parents. *Id.* Mother testified that she had seen graphic child pornography and signs of predatory behavior on a video call with V.D. and his foster parents. *Id.* at 364, 366-368. Mother spent ten days in a psychiatric ward because she talked about the sexual things that had been done to V.D. *Id.* at 357. Mother also noted that Williams stated in an e-mail that V.D. had been screaming uncontrollably and Mother believed that V.D. had not bonded with the foster parents and was not happy with them. *Id.* at 342-346. Mother was confident that, if Williams provided her with the information necessary to find adequate support services, Mother could provide for V.D. in Maryland. *Id.* at 347-351.

**{¶ 12}** Father testified about the ways in which he had made progress on his case plan objectives, despite the fact that he was never given the case plan objectives prior to the hearing. *Id.* at 377-380. Father wanted the case transferred to Maryland and believed that Mother provided proper care to V.D. *Id.* at 380, 389.

{¶ 13} Based on the testimony presented at the hearing, the magistrate issued an order granting temporary custody to MCCS. Mother filed timely objections to the magistrate's decisions. On December 22, 2021, the trial court overruled the objections and granted temporary custody of V.D. to MCCS. Mother filed a timely appeal from this decision.

The Juvenile Court Did Not Abuse Its Discretion By Finding That It Was In V.D.'s Best Interest To Be Placed In The Temporarily Custody of MCCS

{¶ 14} Mother's sole assignment of error states:

THE TRIAL COURT ERRED IN GRANTING TEMPORARY CUSTODY TO MONTGOMERY COUNTY CHILDREN'S SERVICES BECAUSE THAT AGENCY FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT TEMPORARY CUSTODY WAS IN THE BEST INTEREST OF THE MINOR CHILD.

{¶ 15} Initially, Mother contends that "the trial court granted temporary custody to [MCCS] despite testimony indicating that the child was not neglected or dependent." Mother's Brief, p. 7. Pursuant to R.C. 2151.35(A)(1), MCCS must prove by clear and convincing evidence that V.D. was abused, neglected, or dependent. In the April 6, 2021 complaint, Williams alleged that V.D. was a neglected child pursuant to R.C. 2151.03(A)(2), (3) and (6), which define a neglected child as any child "(2) [w]ho lacks adequate parental care because of the faults or habits of the child's parents, guardian, or custodian; (3) [w]hose parents, guardian, or custodian neglects the child or refuses to

provide proper or necessary subsistence, education, medical or surgical care or treatment, or other care necessary for the child's health, morals, or well being;" or "(6) [w]ho, because of the omission of the child's parents, guardian, or custodian, suffers physical or mental injury that harms or threatens to harm the child's health or welfare." Further, Williams alleged that V.D. was a dependent child, which is defined in R.C. 2151.04(B) as any child "[w]ho lacks adequate parental care by reason of the mental or physical condition of the child's parents, guardian, or custodian[.]"

{¶ 16} The trial court found that MCCS had proved by clear and convincing evidence that V.D. was a neglected child. The court stated, in part:

> * * * Mother has failed to provide proper medical care to the child as demonstrated by her failure to acknowledge the severity of the child's developmental delays and her failure [to] take him to the pediatrician as necessary. Further, Mother's failures have resulted in inadequate parental care for the child and place[d] his health and welfare at risk.

December 22, 2021 Decision, p. 6.

{¶ 17} The trial court acknowledged that Mother testified that she had provided at-home physical therapy to the child for some time, but she also testified that the child was discharged from physical therapy because it was no longer needed. The trial court found this testimony was not credible based "on the fact that V.D. has been involved with multiple and an on-going therapeutic service [sic] since June 2020." *Id.*

{¶ 18} The trial court also found that V.D. was a dependent child pursuant to R.C. 2151.04(B). The court reasoned:

[P]rior to the Agency's intervention, the child had significant yet unaddressed developmental delays and was receiving inadequate medical attention. Mr. Jones provided clear and convincing evidence that the Agency's records showed prior involvement with Mother and this child, based at least partially on Mother's mental health diagnoses of bipolar, schizophrenia, and autism * * * .

December 22, 2021 Decision, p. 6-7.

{¶ 19} The trial court's finding that V.D. was a dependent and neglected child was supported by the clear and convincing evidence of record. Jones, Williams, and Jeremy Sturgill provided credible testimony that V.D. was suffering developmental delays while under the care of Mother and that Mother did not make the necessary follow-up appointments. Further, the testimony of Jones and Williams provided clear and convincing evidence that Mother had some untreated mental health issues that affected her ability to provide adequate care for V.D. It is clear that the trial court credited the testimony of Jones, Williams, and Sturgill over the testimony of Mother. Issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact. As the court explained in *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984): "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."

{¶ 20} After a child is adjudicated abused, neglected, or dependent, the juvenile

court may make any of the orders of disposition provided for in R.C. 2151.353(A)(1)-(6). A juvenile court has broad discretion in this disposition. *In re J.H., L.H., C.H.*, 2d Dist. Montgomery No. 29126, 2021-Ohio-3846, ¶ 12. "In choosing among the alternatives, the best interest of the child is the court's primary consideration." *In re L.C.*, 2d Dist. Clark No. 2010-CA-90, 2011-Ohio-2066, ¶ 13, quoting *In re C.W.*, 3d Dist. Wyandot No. 16-09-26, 2010-Ohio-2157, ¶ 11.

{¶ 21} The juvenile court found that the best interest of V.D. supported the option of giving MCCS temporary custody under R.C. 2151.353(A)(2). Mother contends that the juvenile court "did not provide clear and convincing evidence that it was in the best interests of Child to be removed from placement with Mother." Mother's Brief, p. 7. The court's temporary custody decision "must be supported by a preponderance of the evidence." *In re S.M.*, 2d Dist. Montgomery No. 24539, 2011-Ohio-6710, ¶ 4. Preponderance of the evidence simply means " 'evidence which is of a greater weight or more convincing than the evidence which is offered in opposition to it.' " *In re K.S.*, 2d Dist. Darke No. 1646, 2005-Ohio-1912, ¶ 15, quoting *Black's Law Dictionary* 1182 (6th Ed.1998). Moreover, the juvenile "court has substantial discretion in weighing the considerations involved in making the determination regarding a child's best interest." *In re A.W.*, 2d Dist. Montgomery No. 25039, 2012-Ohio-2657, ¶ 17, quoting *In re S.M.* at ¶ 4. The court's determination will not be reversed absent an abuse of that discretion. *In re K.H.*, 2d Dist. Clark No. 2009-CA-80, 2010-Ohio-1609, ¶ 66. A trial court abuses its discretion when its decision is "unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 22} R.C. 3109.04(F)(1) provides the following non-exhaustive list of factors for the court to consider when determining the best interest of a child: (a) the wishes of the child's parents regarding the child's care; (b) the wishes and concerns of the child, as expressed to the court; (c) the child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest; (d) the child's adjustment to the child's home, school, and community; (e) the mental and physical health of all persons involved in the situation; (f) the parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights; (g) whether either parent has failed to make all child support payments; (h) whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; (i) whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court; and (j) whether either parent has established a residence, or is planning to establish a residence, outside this state.

{¶ 23} The juvenile court set forth each of these factors and addressed the evidence of record relevant to each factor. It is clear that the juvenile court credited the testimony of Williams, Jones, and Sturgill over the testimony of Mother. Mother's argument on appeal essentially is that the juvenile court failed to give sufficient weight to those pieces of evidence that Mother asserts to be of most importance. There is no indication in the juvenile court's decision that the evidence cited by Mother was not

considered. Rather, it is clear from the decision that the juvenile court believed other considerations significantly outweighed those highlighted by Mother. The preponderance of the evidence supported the juvenile court's finding that temporary placement with MCCS was in the best interest of V.D.

{¶ 24} It is important to remember that this case involves a temporary placement to MCCS. If Mother and Father embrace their case plans and make consistent progress toward reaching the case plan goals, they ultimately will have the opportunity to regain custody of V.D. Williams testified that both parents have several aspects of their case plans that have not been completed. That is not uncommon. But what is troubling is that Mother has either rejected the need for parts of the case plan or just outright ignored facets of the case. We acknowledge that temporary placement with a public agency can be very frustrating and seem defeating, especially in the short term. But such placement also provides the parents with a unique opportunity to address any issues they are dealing with that have negatively affected their child and, in doing so, greatly benefit the parents and child in the long term.

{¶ 25} Mother's assignment of error is overruled.

II.  Conclusion

{¶ 26} Having overruled Mother's sole assignment of error, the judgment of the juvenile court is affirmed.

. . . . . . . . . . . . .


TUCKER, P. J. and WELBAUM, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Andrew T. French
Alana Van Gundy
Sara M. Barry
Randall Lee Stump, GAL
Hon. Anthony Capizzi