OPINION
{¶ 1} David D. appeals from a judgment of the Miami County Court of Common Pleas, Juvenile Division, which granted permanent custody of his sons, A.D. and S.D., to the Miami County Children Services Board ("MCCSB"). The children's mother, Melinda D., agreed to the agency taking permanent custody of the children. Neither *Page 2 
Melinda nor the couple's two older children, D. R. and K.D., are involved in this appeal. For the following reasons, the judgment of the trial court will be affirmed.
 I. {¶ 2} On January 5, 2004, MCCSB filed a complaint of neglect regarding four siblings, D.R., K.D., S.D., and A.D., alleging that their mother, Melinda, was a crack addict who was failing to provide adequate parental care for the children. The children's father, David, was incarcerated in Florida when the complaint was filed. The trial court promptly adjudicated the children dependent and granted temporary custody to MCCSB.
 {¶ 3} On November 30, 2004, MCCSB requested that the older children be placed in a planned permanent living arrangement (PPLA), and the agency sought permanent custody of eleven-year-old S.D. and twelve-year-old A.D. Melinda agreed to both the PPLA for the older children and to MCCSB taking permanent custody of the younger children. David appealed from that decision. In June 2005, MCCSB filed a motion to amend the permanent custody motion to include grounds that A.D. and S.D. had been in the custody of MCCSB for more than twelve months of the last consecutive twenty-two month period.
 {¶ 4} The magistrate subsequently held hearings regarding David's parental rights. David appeared by telephone from prison and agreed to the PPLA for the two older children. In August 2005, David agreed that S.D. and A.D. should be placed in the permanent custody of MCCSB but that he would continue correspondence with the children. David appealed from the judgment entered after the August 9 hearing, which divested him of all parental rights. After consolidating David's appeals, we reversed *Page 3 
the trial court's grant of permanent custody of S.D. and A.D. to MCCSB, reasoning that we could not conclude that David had fully understood the effect of agreeing to permanent custody. In re D.R., Miami App. Nos. 2005-CA-10 2006-CA-7, 2006-Ohio-3513. David was released from prison on September 16, 2006. On December 6, 2006, the magistrate held another hearing on MCCSB's motion for permanent custody of S.D. and A.D., as well as on David's motion for legal custody. The magistrate concluded that granting permanent custody to the agency was in A.D. and S.D.'s best interest and that it was not in their best interest to grant legal custody to their father. In July 2007, the trial court overruled David's objections to the magistrate's decision and adopted the magistrate's decision.
 {¶ 5} David appeals, arguing that the trial court erred in divesting him of his parental rights.
 II. {¶ 6} On appeal, David asserts that the trial court should not have granted permanent custody to MCCSB, because the agency failed to make reasonable efforts to return his sons to him and because there is no evidence that such efforts would have been futile. MCCSB responds that it satisfied the criteria for R.C. 2151.414(B)(1)(d), the section under which it had pursued permanent custody, and thus the only issue was whether permanent custody to MCCSB was in A.D. and S.D.'s best interest. In his reply brief, David argues that the evidence did not clearly and convincingly demonstrate that permanent custody to MCCSB was in his sons' best interest.
 Reasonable Efforts to Reunify *Page 4 
 {¶ 7} "R.C. 2151.412 requires the agency to prepare and maintain a case plan for children in temporary custody with the goal `[t]o eliminate with all due speed the need for the out-of-home placement so that the child can safely return home.'" (Emphasis added.) In reC.F., 113 Ohio St.3d 79, 2007-Ohio-1104, 862 N.E.2d 816, at ¶ 29, quoting R.C. 2151.412. However, R.C. 2151.419, which requires the trial court to determine whether the agency made "reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home," does not apply to a hearing on a motion for permanent custody filed under R.C. 2151.413.In re C.F. at ¶ 43. Moreover, "the procedures in R.C. 2151.414 do not mandate that the court make a determination whether reasonable efforts have been made in every R.C. 2151.413 motion for permanent custody." Id. at ¶ 42. Nevertheless, the agency must establish that it made such efforts prior to the termination of parental rights. Id.
 {¶ 8} As argued by David, the record reflects that MCCSB did not develop a case plan for him and the agency's case plan was directed toward Melinda, the residential parent. Although MCCSB's efforts were directed solely toward Melinda, such an approach was reasonable considering that David was incarcerated when the children entered temporary custody and would remain incarcerated for another two and one-half years. In other words, at the time MCCSB obtained temporary custody of A.D. and S.D., David had no home for the children and there was no hope of reunification with David for more than two years. When MCCSB filed its motions for permanent custody of A.D. and S.D., David had more than a year left on his prison sentence. Since 2004, the trial court repeatedly determined that MCCSB had made *Page 5 
reasonable efforts to prevent the need for continued removal of the children from their home. (See Entry of Disposition as to Natural Father, March 23, 2004; Agreed Entry Changing Disposition as to Natural Mother, Feb. 11, 2005; Agreed Entry Changing Disposition as to Natural Father, Dec. 15, 2005). Considering that the agency's goal was to preserve or to reunify the family unit "with all due speed," the agency efforts to reunite A.D. and S.D. with Melinda, but not with David, was reasonable.
Best Interest of the Children
 {¶ 9} R.C. 2151.413 indicates when a children services agency may seek permanent custody of a child. With some exceptions, R.C. 2151.413(D) generally requires a children services agency to pursue permanent custody of a child that has been in the agency's temporary custody for twelve or more months of a consecutive twenty-two month period. Here, the record establishes that A.D. and S.D. had been in temporary custody for more than twelve months of a consecutive twenty-two month period at the time that MCCSB filed its amended motion for permanent custody.
 {¶ 10} R.C. 2151.414(B) then sets forth the circumstances under which a court may grant permanent custody of a child to a children services agency. If the child has been in the custody of the children services agency for twelve or more months of a consecutive twenty-two month period at the time the motion for permanent custody is filed, the court need only determine whether permanent custody is in the child's best interest. R.C. 2151.414(B)(1)(d). The court need not consider whether the child can be placed with either parent within a reasonable time or should not be placed with the child's parents, as would be required under R.C. 2151.414(B)(1)(a). In re C. W., 104 Ohio St.3d 163, 166-167,2004-Ohio-6411, 818 N .E.2d 1176,1179, at ¶ 21. All of the *Page 6 
court's findings must be supported by clear and convincing evidence. R.C. 2151.414(E); In re J.R., Montgomery App. No. 21749, 2007-Ohio-186, ¶ 9.
 {¶ 11} R.C. 2151.414(D) directs the trial court to consider all relevant factors when determining the best interest of the child, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable.
 {¶ 12} The factors in R.C. 2151.414(E)(7) through (11) include: convictions of various crimes like homicide, assault and child endangerment; withholding food or medical treatment from a child; abandonment of the child; placing the child at substantial risk of harm two or more times by drug or alcohol abuse and refusal of treatment; and involuntary termination of parental rights with regard to a sibling. None of these factors apply in this case.
 {¶ 13} The evidence presented during the permanent custody hearing revealed the following facts.
 {¶ 14} A.D. was born in October 1992, and S.D. was born in November 1993. According to David, S.D. and A.D. resided with their parents and two older siblings until 1996, when David and Melinda divorced. David returned to Florida but maintained contact with the children through telephone calls. In 1998, David brought S.D. and his oldest son to Florida at Melinda's request. Shortly afterward, the other two children *Page 7 
came to Florida, and they lived with David until 2000. On December 19, 2000, David was incarcerated on alcohol-related driving offenses, and the children returned to Ohio to live with Melinda. David remained in prison until July 25, 2002. During the following summer, S.D. and A.D. spent approximately six weeks vacationing with David in Florida. David was again incarcerated on October 29, 2003 for a felony DUI and driving without a license. The children again resided with Melinda in Ohio.
 {¶ 15} S.D., A.D., and their siblings came into MCCSB's custody on January 5, 2004. S.D. was ten years old. A.D. was eleven. The brothers have remained in MCCSB's custody since that time.
 {¶ 16} S.D has been in the same foster home since he came into MCCSB's custody and he has a good relationship with his foster parents. S.D. told Dr. Jeanne Bohrer, the guardian ad litem, and Bob Wheelock, the MCCSB caseworker, that he prefers to stay with his foster parents because of the stability it provides him. S.D. expressed concerns about the future should his father regain custody, particularly concerns about substance abuse, domestic violence and/or assault and other legal matters, as well as his father's ability to maintain a job and proper housing. S.D. has friends in the neighborhood, and he visits with A.D. and his two older siblings.
 {¶ 17} According to Bohrer, A.D. vacillated about whether he wanted to be with his father. She indicated that A.D. voiced the same concerns about David as S.D. but also wanted to be with David "because he's my dad." Bohrer indicated that A.D.'s reasons for living with his father are based on his father being family and he might be able to see his mother if he lived with his father. Wheelock similarly stated that A.D. felt that if he lived with David, his parents could have shared custody and he could see *Page 8 
his mother.
 {¶ 18} A.D. had lived with the same foster parents as S.D. for more than two years, but was removed in June 2006 due to behavioral issues. A.D. was recently placed with a single man in Troy, with whom A.D. has bonded. A.D. was seriously considering being adopted by his new foster father; A.D. had never previously considered adoption.
 {¶ 19} Since David's release from prison in September 2006, David saw A.D. in Piqua without the knowledge or consent of MCCSB. After the brief meeting, A.D. stated to Wheelock that "Dad's not all that." Given the context, A.D.'s statement suggested that he was not impressed with his father.
 {¶ 20} S.D. expressed to Bohrer that he did not know his father well, and Bohrer testified that she did not think there was a significant bond between A.D. or S.D. and their father. Alvin Bailey, the boys' therapist, also testified that he was unaware of a relationship between the boys and their father. At the children's assessment with Bailey, A.D. and S.D. indicated that they had not had contact with their father for approximately five or six years. Due to the span of time between significant contact with the children, Bailey stated that he did not know of "any particular bonding relationship or any consistent relationship" with David.
 {¶ 21} Bohrer recommended permanent custody to MCCSB for both S.D. and A.D. She stated that it was "extremely important" for S.D. to have permanence and that permanent custody to MCCSB would best achieve the desired permanency. Bohrer questioned whether David would be successful in his rehabilitation, given his "patterns of behavior." Wheelock also testified that he "would like to see the boys stay *Page 9 
where they are." Bailey further indicated that A.D. and S.D. both had adjustment problems when they entered temporary custody and that the process of possibly reuniting with Melinda and then possibly reuniting with David has had a detrimental impact on the boys.
 {¶ 22} Following his release in 2006, David returned to Ohio to address the custody matter and two pending criminal cases in Miami County and Shelby County, Ohio. Prior to the permanent custody hearing, David was jailed in Shelby County on pending assault and contempt charges. The assault charge was subsequently amended to disorderly conduct and David was ordered to pay fines. At the time of the hearing, David had a pending criminal case in Miami County that involved charges of criminal trespass, driving under suspension, and operating a motor vehicle while under the influence of drugs or alcohol. David was $48,000 in arrears on child support payments.
 {¶ 23} David testified that his permanent residence is in Florida, and that the children would live with him there. He currently lives in a two bedroom home with a friend from prison and his friend's elderly mother. David stated the friend did "a very short time" in prison for criminal mischief, and he would not have concerns about his sons visiting or living there. David stated that they are putting a 900 square foot addition on the home, which will have a laundry room, master bath, living room, and screened enclosure. The addition was "at the drywall stage," and he predicted it would be completed by the middle of January 2007. David stated that the boys would use mass transit or bike routes if they lived with him.
 {¶ 24} David stated that he was currently receiving disability payments, rent *Page 10 
assistance, and food stamps. David indicated that he has four herniated discs in his lower back, a broken vertebrae, and cardiopulmonary problems. David planned to apply for Social Security Disability and obtain vocational rehabilitation. While at Lotty Correctional Institute, David completed a computer-assisted design vocational program. David stated that he was interested in nuclear medicine, and that he spoke with the Department of Vocational Rehabilitation in Florida about a two-year program. David stated that "it's fairly lucrative so in two years I can probably be makin[g] about fifty grand to start."
 {¶ 25} David stated that he is a recovering alcoholic. In 2004, David completed the Modality II program, a therapeutic community residential treatment program, at Jefferson Correctional Institution. Since his release, David has been attending a dual-diagnosis treatment program twice per week and Alcohol Anonymous meetings once per week. Discussing his support network, David stated that he had joined a small church and that his mother and step-father live in the area. David predicted he would be off probation in September 2007.
 {¶ 26} David sought information about his children's welfare and attempted to maintain contact with them throughout the case. David wrote to the children on a monthly basis and occasionally received letters in return. David stated that it was "absolutely" in A.D. and S.D.'s best interest to be with him and that he could not "think of anything that would be in their better interest."
 {¶ 27} Upon review of the record, we agree with the trial court that there is clear and convincing evidence that permanent custody of A.D. and S.D. to MCCSB was in the best interest of the children. The evidence established that S.D. and A.D. had *Page 11 
been in foster care for nearly three years and that they needed permanency. Bailey, Wheelock, and Bohrer all believed that permanent custody to MCCSB would best accomplish that goal. S.D. had been in the same foster home for nearly three years, had a very strong bond with his foster parents, and was concerned about his father's ability to parent him. S.D. wanted to stay with his foster parents. Although A.D. wanted to maintain his connection with his parents, particularly his mother, he also had concerns about returning to his father. A.D.'s relationship with his new foster father was promising, and A.D. was considering being adopted by him.
 {¶ 28} Although David regularly wrote to his sons and wanted to be involved throughout this case, his repeated incarcerations limited his involvement in his children's lives. With the exception of approximately six weeks, David had not parented his children for approximately six years — nearly half the children's lives. Although the boys knew David to some extent, there is little indication of a strong bond with him.
 {¶ 29} David indicated that he would be able to provide for his children "[e]very day of the week for the rest of their lives if I have to." However, he currently lives in a two-bedroom home with two other individuals in Florida. Granting legal custody of the boys to David would result in the children being relocated to Florida, causing great upheaval for the children. David is subsisting through rent vouchers, food stamps, and disability payments, and he hopes to have employment in nuclear medicine in approximately two years. David's current situation raises questions about his present ability to adequately provide for his children. While we commend David's efforts to achieve sobriety in prison, there is little evidence (not surprisingly, given David's recent *Page 12 
release from prison) that David could maintain his sobriety outside of the prison system, particularly given his long-standing history of alcoholism and his repeated alcohol-related criminal conduct. His sons expressed concerns that David would have substance abuse and legal problems.
 {¶ 30} In our judgment, there was clear and convincing evidence that permanent custody of A.D and S.D. to MCCSB was in the children's best interest.
 {¶ 31} The assignment of error is overruled.
 III. {¶ 32} Having overruled the sole assignment of error, the judgment of the trial court will be affirmed.
 FAIN, J. and GRADY, J., concur. *Page 1