[Cite as *In re S.S.*, 2011-Ohio-5697.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MIAMI   COUNTY

IN THE MATTER OF:            :

                                       :      Appellate Case No. 2011-CA-07

     S.S., D.S., and L.M.     :

                                         :      Trial Court Case Nos. 20730426
                                         :                               20730427
                                         :                               20730428
                                         :

                                         :      (Criminal Appeal from
                                         :       Common Pleas Court)

                                         :

. . . . . . . . . . .

## O P I N I O N

Rendered on the 4th day of November, 2011.

. . . . . . . . .

JEANNINE N. PRATT, Atty. Reg. #0064699, Miami County Prosecutor's Office, Miami County Safety Building, 201 West Main Street, Troy, OH 45373
      Attorney for Appellee

GARY C. SCHAENGOLD, Atty. Reg. #0007144, 4 East Schantz Avenue, Dayton, Ohio 45409
      Attorney for Appellant

. . . . . . . . .

HALL, J.

{¶ 1}   This case is before the Court on a mother's appeal of a juvenile-court order granting permanent custody of three of her children[1] to appellee, Miami County Children's Services. Two of the children, S.S. (daughter) and D.S. (son), are

---

[1]Mother's oldest child, K.H., born September 25, 1996, is, says Mother in her brief, living with an uncle in a planned permanent living arrangement.

twins, born June 27, 2003, making them just shy of 6 years old when the permanent-custody hearing was held. L.M. (son) was born April 26, 2006, making him 3 years old at the time.

{¶ 2} In 2007, under an agreed order, the children were adjudicated dependent, and Children's Services obtained protective supervision of them, though they remained with Mother in their home. But in April 2008, after two of the children were found wandering outside unsupervised, Children's Services removed the children from their home and received temporary custody of them. This too was done under an agreed order. Mother was convicted on two counts of endangering her children and sentenced to probation. On March 30, 2009, the day before Mother was to be released from jail (where she had been for the past month or so for violating her probation by using illegal drugs) Children's Services moved for permanent custody of the three children.

{¶ 3} The permanent-custody hearing was held on June 10, 2009, before a magistrate. The magistrate found that, at the time the permanent-custody motion was filed, almost a year after the children were removed, Mother had failed to make any progress on the plan that would reunite her with the children. The magistrate further found that, since they were removed, Mother had not seen the children at all because she never provided Children's Services with a clean urine screen. Finally, the magistrate found that, even though Mother had recently begun making progress, she would not be ready to care adequately for the children for at least another six months. Based primarily on these findings, the magistrate recommended that Children's Services be granted permanent custody of all three children. Mother

objected, but the juvenile court dismissed the objections as untimely and adopted the magistrate's recommendation. Mother appealed, and this Court reversed, instructing the juvenile court on remand to consider Mother's objections. See *In re S.S.*, Miami App. No. 09-CA-36, 2010-Ohio-992.

{¶ 4} In March 2011, the juvenile court overruled all but one of Mother's objections. The court again adopted the magistrate's recommendation, granting Children's Services permanent custody of the children.

{¶ 5} Mother appealed.[2]

**A. Standard of Review**

{¶ 6} A juvenile court's decision to grant permanent custody, and concomitantly terminate parental rights, must be supported by clear and convincing evidence. See *In re L.C.*, Clark App. No. 2010 CA 90, 2011-Ohio-2066, at ¶14, citing R.C. 2151.414(B)(1). We will not disturb the court's decision on evidentiary grounds "if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." Id., citing *In re Forrest S.* (1995), 102 Ohio App.3d 338, 344-345.

{¶ 7} The ultimate decision to grant permanent custody of a child to a children's services agency is within the court's discretion. See R.C. 2151.414(B)(1) (stating that "the court *may* grant permanent custody of a child" (Emphasis added.)). "We review the trial court's judgment for an abuse of discretion." *In re L.C.*, at ¶14,

---

[2]Neither S.S. and D.S.'s father nor L.M.'s father has appealed the termination of his parental rights or has sought to participate in Mother's appeal, so we will not consider them further.

citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, at ¶48. "Abuse of discretion implies that the trial court's decision was unreasonable, arbitrary or unconscionable." *In re S.S.*, at ¶22, citing *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219. Unless we find that the court abused its discretion we will defer to its judgment. Id. ("When applying the abuse of discretion standard, an appellate court may not merely substitute its judgment for that of the trial court."), citing *Berk v. Mathews* (1990), 53 Ohio St.3d 161, 169. Therefore the adoption of a magistrate's decision "will only be reversed [if] it appears that the trial court's actions were arbitrary or unreasonable." Id. (Citation omitted.).

**B. A Court's Power to Grant Permanent Custody to a Children's Services Agency**

{¶ 8} Section 2151.414 of the Revised Code gives a court the power to grant permanent custody of a child to a children's services agency. See R.C. 2151.414(B)(1). Before the court may exercise this power, though, the statute requires that it determine, by clear and convincing evidence, that at least one of the conditions enumerated in the statute applies and that the court determine, again, by clear and convincing evidence, that granting permanent custody to the agency is in the child's best interest. Id. In addition to these two determinations, although R.C. 2151.419 does not mandate that the court make a finding in the permanent custody hearing that reasonable efforts have been made to reunify the family, at some point before the court may grant permanent custody, the agency must establish that it made reasonable efforts to reunite the child and parent(s). See *In re A.D.*, Miami App. No. 2007 CA 23, 2008-Ohio-2070, at ¶7, citing R.C. 2151.419(A)(1). Here the

magistrate's decision made both determinations and the finding of fact. Mother contends that the evidence is insufficient to support any of them.

**C. The Determination that the Children Cannot be Placed with Mother within a Reasonable Time or Should Not be Placed with Her**

{¶ 9}   The condition that the magistrate determined applies here is the one described in R.C. 2151.415(B)(1)(a), which applies when "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents." A court must determine that this condition applies if, considering all relevant evidence, it determines, by clear and convincing evidence, that one of the circumstances enumerated in R.C. 2151.414(E) exists. The circumstance that the magistrate determined exists here is this: "The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child." R.C. 2151.414(E)(4).

{¶ 10} In the first assignment of error, Mother contends that the evidence is insufficient to support the court's finding that she demonstrated a lack of commitment toward the children. Mother also contends that it would be reasonable to wait six months to place the children with her.

{¶ 11} Mother admits that she abused drugs for over 10 years. In 2003, she underwent in-patient drug rehabilitation, but in 2008, she was still using drugs regularly. Most often Mother used marijuana, but she also used crack cocaine, powered cocaine, and heroin. She also abused prescription medicine–some

prescribed to her, some not. Mother testified that she is merely a "weekend user," meaning she did not use drugs every day. She acknowledged her relapses but said that relapse is part of recovery. She was confident that, since she had gotten clean before, she could get clean again.

{¶ 12} Children's Services became involved in 2007. At that time, under an agreed order, the children were adjudicated dependent and Children's Services was granted protective supervision of them, though the children remained in their home. In April 2008, two of the children were found wandering about outside unsupervised. Children's Services immediately removed the children and, under an agreed order, was granted temporary custody. Mother was convicted on two counts of child endangering and sentenced to 2 years of probation.

{¶ 13} Children's Services developed a case plan for Mother the goal of which was her reunification with the children. At the time that Children's Services moved for permanent custody almost a year later, Mother had failed to make any progress on the plan. The plan required Mother, in part, to participate in individual therapy and to follow all the therapist's recommendations; to attend weekly AA/NA meetings and provide proof of attendance; to obtain a sponsor to help her recovery; to participate in developing, and successfully complete, a budget with the help of a Children's Services case aide; to take the medication that she was prescribed in the amount prescribed; and to submit to random urine screens. The case plan allowed Mother to visit with the children provided that her urine screens were negative for illegal drugs.

{¶ 14} Clean drug screens were also a condition of Mother's probation. In November 2008, Mother was jailed after a screen was positive. Upon her release the

following month, a screen was negative, so Mother sought to visit with the children. Children's Services, however, decided that, since so much time had passed since she last saw the children, and since she had made so little progress on her case plan, Mother would need to demonstrate significant progress before she could visit the children. Mother was told that her progress would be measured by having six clean screens. Mother agreed to this change, though the visitation terms of the case plan were not amended.

{¶ 15} Mother's problems continued after her release from jail in December. That same month she was evicted from her home. And in January 2009, Mother again failed a drug screen, which showed cocaine and was "trackable" for opiates. Mother admitted that she used heroin. On February 17, 2009, she was jailed again.

{¶ 16} On March 30, 2009, the day before Mother was to be released, Children's Services moved for permanent custody of the children.

{¶ 17} During the two months between Mother's release from jail and the June 10 permanent-custody hearing, Mother started to make some progress on her case plan. She had several clean drug-screens, began working 25-35 hours each week as a housekeeper at a hotel, and began participating in Women's Outreach, an intensive probation program through the Miami County Municipal Court. Mother testified that she expected to be eligible for transitional housing soon, though this would be an efficiency apartment, not large enough for the children. Mother asserted, though, that she hoped to obtain independent housing in 4-6 months, when she anticipated she would be ready to care for the children.

{¶ 18} But the caseworker and guardian ad litem were not convinced. Both

testified that, for the children, permanence and stability were critically important. Neither believed that Mother could provide this.

{¶ 19} Agreeing, the magistrate found that, despite her recent progress, Mother would not be able to provide an adequate permanent home for the children until late 2009 at the earliest. Given the children's ages and Mother's complete failure to make any progress during the preceding year, the magistrate found that this was not a reasonable period of time to wait. For a year, said the magistrate, Mother did not participate in individual counseling or get a job, both critical parts of her case plan. The root problem was Mother's continued drug use. Despite knowing that in order to see the children she needed to produce clean drug-screens, and despite the availability of a drug counselor, Mother did not stop using drugs. Consequently, Mother did not see the children for almost a year. Also, her drug use violated the terms of her probation for which Mother was twice that year jailed. The magistrate also pointed out that, though at the time of the hearing she was gainfully employed, it was the first job that she had since the children were removed.

{¶ 20} In adopting the magistrate's decision, the juvenile court too noted the evidence of Mother's recent change but said that it was simply too little, too late:

{¶ 21} "This court is not unmindful of evidence that [Mother] had recently found a job, lived at Franklin House, and had clean urine screens. However, these events come too late in a long process that gave [Mother] numerous and multiple opportunities to 'come clean,' become employed, visit (if clean) with her children, and comply with the rules that she agreed to in her Case Plan. Her children deserve the stability of a relationship and a chance at a positive living atmosphere. Her request

for more time and more help is (as this court finds) a last ditch plea at continuing an unsuccessful rehabilitation." March 2, 2011 Decision, p.4.

{¶ 22} Mother says that her failure to visit or communicate with the children was not because of her lack of commitment to the children. It was, she contends, Children's Services's fault because Children's Services failed to help her visit and communicate with the children. Mother alleges that Children's Services prevented her from visiting with the children by requiring her to present a drug-free urine screen first, a condition, she says, that was punitive and unfair. And, says Mother, in December 2008, when she presented a clean screen, Children's Services told her that she needed to present six clean screens before she could visit the children. Mother also blames Children's Services for her failure to make progress on her case plan. Mother claims that early on she did address her case plan and stayed in regular contact with the caseworker. But a new caseworker was assigned in July 2008 who failed to keep in contact with Mother. Soon after the new caseworker was assigned she went on maternity leave. And, when she returned two months later, the caseworker failed to contact Mother. Mother says that she finally contacted the caseworker in December 2008 to ask about visiting the children.

{¶ 23} The court said that the fault for Mother's failure to visit with the children lies solely with her: "she prevented visits and reintroduction attempts by her own voluntary actions." March 2, 2011 Decision, p.4. Regarding the increase in clean screens, Children's Services explained that, since Mother had not made much of any progress on her case plan, it was trying to help Mother take her issues seriously and work to remedy them. It notes that Mother agreed to this modification. While six

clean screens is "a somewhat arbitrary requirement," *In re S.S.*, at ¶30, it would have been reasonable for Children's Services to place little weight on the clean screen Mother provided in December 2008. Mother had just been released from jail, where, for the previous month or so, her opportunity to use drugs was rather limited. Also, hindsight gives Children's Services's decision not to allow visitation after that clean screen a decidedly positive patina: the very next month, Mother's screen was dirty. We note too that Mother agreed to the visitation condition.

{¶ 24} Regarding the case plan and contact with the caseworker, we agree with Children's Services's argument that Mother knew what the plan required of her. If she had questions about it, Mother could have called the caseworker or the agency. As the juvenile court succinctly said, Mother was committed but her commitment was misplaced: "It appears [Mother] was committed to wanting to visit, but not committed to meeting the requirements of her Case Plan." March 2, 2011 Decision, p.4.

{¶ 25} A remarkable omission from Mother's argument is citations to evidence from before Children's Services moved for permanent custody. In our first opinion in this case, in dicta, we were skeptical about the relevance of Mother's motivational source: "It is also true that her improvement (clean urines, employment, habitation) has only come recently, or as Samuel Johnson said, 'Depend upon it, sir, when a man knows he is to be hanged in a fortnight, it concentrates his mind wonderfully.' Whether sobriety and responsibility are the result of coercive actions by the State or are self-motivated by the individual seems irrelevant." *In re S.S.*, at ¶31. "We are not prepared to hold," we continued, "that addiction, or absences from one's children

during struggles to escape addiction, are, in and of themselves, sufficient causes to remove children from their parents permanently." Id. (Citation omitted.). Here, though, there is no evidence that Mother was actively struggling to escape addiction during the year after the children were removed (really, ever since Children's Services was granted protective custody in 2007).

{¶ 26} Mother also contends that waiting 4-6 months after the hearing to place the children with her was reasonable. She points out that, in March 2009, the children were removed from their foster home and placed in two separate foster homes. The children, Mother asserts, were no closer to achieving a permanent placement than they had been when they were removed. Mother points to the post-permanent-custody-motion evidence that suggests she was making progress toward being able to provide the children with a stable home: she had been drug free for the past 3 months; she had a job; and she was doing well at the family abuse shelter and had a plan to obtain independent housing. The juvenile court was unconvinced. The court pointed out that it was only after loss of permanent custody became a reality that Mother started to reform. For a year before, Mother failed to remain drug-free even though that prevented her from seeing the children. It pointed out that for a year Mother did not work on the case plan, did not seek help from a counselor, and did not get a job. Moreover, said the court, she was jailed twice.

{¶ 27} We conclude that sufficient competent, credible evidence exists to support the court's firm belief or conviction that placing the children with Mother is not appropriate. While Mother started to reform, whether she successfully completes a reformation is speculation. See *In re J.C.,* Adams App. No. 07CA834,

2007-Ohio-3783, at ¶25 (noting that "whether the mother successfully completes the [drug treatment] program is speculation"). As the magistrate and juvenile court repeatedly pointed out, during the year after the children were removed, Mother did nothing to get them back or even see them. As another court has put it, "the trial court is not required to deny * * * [a] permanent custody motion simply based upon the groundless speculation that the mother might successfully complete her drug treatment, be released from prison, find adequate housing for the children, and remain drug-free." Id. By her own admission, Mother abused drugs for over 10 years. It is true that during the two months before the hearing Mother finally appeared to be taking the necessary steps toward recovery. Still, "there is simply no indication that [she] has remedied her substance abuse problem." *In re Philips*, Astabula App. No. 2005-A-0020, 2005-Ohio-3774, at ¶42.

{¶ 28} "[A parent] is afforded a reasonable, not an indefinite, period of time to remedy the conditions causing the children's removal." *In re L.M.*, Ashtabula App. No. 2010-A-0058, 2011-Ohio-1585, at ¶50. Ohio courts uniformly hold that "[n]on-compliance with a case plan is grounds for termination of parental rights." *In re Campbell* (2000), 138 Ohio App.3d 786, 793 (Citation omitted.); see, e.g., *In re W.A.*, Franklin App. Nos. 06AP-485, 06AP-486, 2006-Ohio-5750, at ¶17 ("Failure to complete significant aspects of a case plan, despite opportunities to do so, is grounds for terminating parental rights.") (Citations omitted.); *In re Brofford* (1992), 83 Ohio App.3d 869 ("[n]on-compliance with the case plan is a ground for termination of parental rights"). As one court explained, non-compliance is a serious failure because "the case plan's objectives are geared toward remedying the conditions that

initially caused the child's removal." *In re Bailey* (July 20, 2001), Geauga App. No. 2001-G-2340. Also, the failure to take advantage of opportunities presented demonstrates a lack of commitment, which supports a finding that a child cannot be placed with the parent within a reasonable time. See *In re Campbell*, at 793 (Citations omitted.).

{¶ 29} Mother failed to take advantage of the counselors and advisors ready and willing to help her follow the plan to reunify with the children. Even though mother was employed at the time of the hearing, she had been working less than two months, and the job was her first since the children were removed a year before. Her failure to get a job sooner was likely at least one reason that she was evicted from her home. This evidence suggests an unwillingness to provide an adequate permanent home for the children. Combined with Mother's failure to work on the case plan, the court's firm belief was reasonable that the evidence demonstrates the children's need for secure placement that only permanent custody can provide. See *In re L.M.*, at ¶49-50.

{¶ 30} The first assignment of error is overruled.

**D. The Determination that Permanent Custody to Children's Services is in the Children's Best Interest**

{¶ 31} "R.C. 2151.414(E) requires the trial court to find that the child cannot be placed with either of his or her parents within a reasonable time or should not be placed with the parents once the court has determined by clear and convincing evidence that one or more of the eight factors exist. Once the trial court finds from all relevant evidence that one of the eight factors exists, it then must consider whether

permanent commitment is in the best interest of the child. R.C. 2151.414(B). Only then may it grant permanent custody of the child to the agency." *In re William S.*, 75 Ohio St.3d 95, 99, 1996-Ohio-182. In the second assignment of error, Mother contends that the evidence is insufficient to support the determination that it is in the children's best interest to grant permanent custody of them to Children's Services.

{¶ 32} In determining best interest, R.C. 2151.414(D)(1) requires a court to consider "all relevant factors," which include those among the factors listed in the statute. Here the relevant statutory factors are the child's relationships with those who are significant in the child's life; the custodial history of the child; and the need for legally secure permanent placement and whether such placement can otherwise be attained. R.C. 2151.414(D)(1)(a), (c), (d).[3] Not every statutory condition need exist before a best-interest determination may be made. See *In re K.H.*, Clark App.

---

[3] "In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:

"(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

"* * *

"(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

"(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

"* * *" R.C. 2151.414(D)(1).

No. 2009-CA-80, 2010-Ohio-1609, at ¶57; *In re A.M.L.B.*, Wayne App. No. 08CA0028, 2008-Ohio-4944, at ¶8 (holding that "[t]he trial court did not err by failing to discuss an irrelevant best interest factor"). And no one statutory factor is most important. See *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, at ¶56 ("There is not one element that is given greater weight than the others pursuant to the statute.").

{¶ 33} Here the magistrate found, by clear and convincing evidence, that it was in the children's best interest to grant Children's Services permanent custody, after considering several aspects of the children's relationships. The magistrate found that the children have no ongoing relationships with extended family and no extended-family members had asked that the children be placed with them. The magistrate also found that none of the parents has maintained any consistent contact with the children. Mother, of course, had not seen the children in almost a year. And the caseworker testified that none of the children had showed any interest in seeing her. The magistrate found that the children lack any apparent ties to their (respective) parents and found that S.S.'s, D.S.'s, and L.M.'s most significant relationships are with each other.

{¶ 34} For almost a year the children were living in the same foster home. In March 2009, D.S. had to be separated because of his behavior toward S.S. But the magistrate found that Children's Services was addressing D.S.'s behavior problems. The agency's intent is to place S.S. and L.M. into D.S.'s foster home. Children's Services hopes that this home will become the children's adopted home (if it obtains permanent custody).

{¶ 35} Mother asserts that the children's most significant relationship is with her, contrary to the caseworker's opinion. Mother contends that both the caseworker and the guardian ad litem are not competent to testify about the children's best interest because neither had ever seen the children with her. Mother cites no affirmative evidence, though, suggesting that the children have any meaningful relationship with her. The juvenile court said that other observations by the caseworker could justify her opinion regarding the children's most significant relationships. The court recognized some validity to Mother's contention concerning the caseworker's and guardian ad litem's testimony but said that it would still accept their opinions, though it would accord them the appropriate weight.

{¶ 36} Mother contends that it was in the children's best interest to extend temporary custody for 6 months. This would give Mother an opportunity to continue to work on the case plan, on which she had recently made significant advances. And, says Mother, an extension would give her a chance to prove that she could complete the plan. The magistrate was unmoved by the recent positive evidence, being troubled by Mother's drug-use history and her attempts to justify her use of drugs and her relapse: "Given the total lack of progress on case plan services, the seriousness of the consequences for failing to become and remain drug free, including loss of contact with her children and incarceration, these statements [Mother's testimony that she used drugs only on the weekends and that relapse is simply part of recovery] are worse than self serving. They show a failure to grasp the impact of her addiction and choices on her children. The children's best interest demands that their parent and custodian make decisions with them uppermost in

mind. In these cases, there has been an ongoing failure by [Mother] to do so." July 6, 2009 Magistrate's Decision and Journal Entry, ¶44.

{¶ 37} Supporting the magistrate's decision was testimony from the caseworker and the guardian ad litem. Both said that they believe permanent custody is in the children's best interest. The guardian ad litem said that she initially considered the option of extending temporary custody but ultimately decided that it would not be in the children's best interest to do so.

{¶ 38} We conclude that sufficient competent, credible evidence exists to support the court's firm belief or conviction that granting permanent custody to Children's Services is in the children's best interest.

{¶ 39} The second assignment of error is overruled.

**E. The Finding that Children's Services Made Reasonable Reunification Efforts**

{¶ 40} In the third assignment of error, Mother contends that the evidence is insufficient to support the court's finding that Children's Services made reasonable efforts to reunite her with the children. Mother makes no new arguments, citing in support the arguments she made in the first two assignments of error.

{¶ 41} Before granting permanent custody to a children's services agency, the court must find that the agency "made 'reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home.'" *In re A.D.*, Miami App. No. 2007 CA 23, 2008-Ohio-2070, at ¶7, quoting *In re C.F.*, 113 Ohio St.3d 79, 2007-Ohio-1104, at ¶43; R.C. 2151.19(A)(1). If before the hearing on

permanent custody this has not been established, then it must be established at the hearing. *In re C.F.*, at ¶43.

{¶ 42} The magistrate found, by clear and convincing evidence, that Children's Services made reasonable efforts to prevent continued removal of the children from their home and to provide case-plan services and case management for reunification. The magistrate further found, by clear and convincing evidence, that Children's Services made reasonable efforts for permanency planning by providing appropriate case-plan services for purposes of reunification and by moving for permanent custody when it appeared that reunification was not in the children's best interest. The magistrate said that the agency failed because Mother failed to make timely progress on the case plan, failed to maintain contact with the children, and failed to stay out of jail. It was Mother, not Children's Services, who failed to make reasonable efforts toward reunification by for a long time failing to make any progress on her case plan despite the services that the agency offered. The evidence is sufficient to support the court's finding. See *In re A.W.*, Montgomery App. No. 21309, 2006-Ohio-2103, at ¶25 (saying that "[t]he record makes clear that it was [mother], and not [the agency], who failed to make reasonable efforts to facilitate reunification," in part, because of mother's failure to complete her case plan objectives).

{¶ 43} The third assignment of error is overruled.

## F. The Grant of Permanent Custody to Children's Services

{¶ 44} Just because a court makes both determinations and the factual finding doesn't mean that it must grant permanent custody to the agency. See R.C.

2151.414(B)(1) (stating that "the court *may* grant permanent custody of a child to a movant" (Emphasis added.)). The court here did grant permanent custody. Given the evidence presented, we cannot say that the court's decision to do so was arbitrary or unreasonable. We therefore defer to the court's judgment.

{¶ 45} The juvenile court's custody order is affirmed.

. . . . . . . . . . . . .

GRADY, P.J., and DONOVAN, J., concur.

Copies mailed to:

Jeannine N. Pratt
Gary C. Schaengold
Hon. W. McGregor Dixon, Jr.