[Cite as *In re C.P.*, 2021-Ohio-4504.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | |
|---|---|
| IN RE: C.P. and G.P. | : |
| | : |
| | :     Appellate Case Nos. 29209 and 29210 |
| | : |
| | :     Trial Court Case Nos. |
| | :     F-2013-005274-0K, 0L, 0O and |
| | :     F-2019-002065-0F, 0G, 0J |
| | : |
| | :     (Appeal from Common Pleas Court- |
| | :     Juvenile Division) |

. . . . . . . . . . .

O P I N I O N

Rendered on the 22nd day of December, 2021.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by HEATHER N. KETTER, Atty. Reg. No. 0084470 and J. JOSHUA RIZZO, Atty. Reg. No. 0099218, Assistant Prosecuting Attorneys, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
    Attorneys for Appellee, Montgomery County Children Services

ROBERT ALAN BRENNER, Atty. Reg. No. 0067714, P.O. Box 340214, Dayton, Ohio 45422
    Attorney for Appellant, Father

P.J. CONBOY, II, Atty. Reg. No. 0070073, 5613 Brandt Pike, Huber Heights, Ohio 45424
    Attorney for Appellant, Mother

. . . . . . . . . . . . .

TUCKER, P.J.

{¶ 1} The Montgomery County Court of Common Pleas, Juvenile Division, granted permanent custody of Mother and Father's two minor children, C.P. and G.P., to Montgomery County Children Services ("MCCS"). Both parents appeal, arguing that the court's decision was not supported by the evidence. After reviewing the record, we disagree, and we affirm the trial court's judgments.

## I. Factual and Procedural History

{¶ 2} Mother and Father are an unmarried couple who appear to have lived together on and off for a number of years. In May 2013, when Mother gave birth to C.P., both Mother and C.P. tested positive for opiates. MCCS filed a complaint alleging C.P. to be abused and dependent. Following an adjudication finding that C.P. was abused and dependent, she was placed in the legal custody of Father. On January 3, 2019, following a law enforcement removal, C.P. was placed in the temporary custody of MCCS. C.P. is severely autistic and has limited verbalization ability.

{¶ 3} Mother gave birth to G.P. on March 13, 2019. The birth took place in a home in Dayton. After giving birth, Mother tied the umbilical cord with a shoe lace and called 911. Mother and G.P. were transported by ambulance to Miami Valley Hospital, where the child tested positive for drugs. G.P. weighed only three pounds and her body temperature was dangerously low. G.P. required two days of medical intervention in order to stabilize her temperature. She remained hospitalized until she reached the approximate gestational age of 35 weeks and no longer required supplemental oxygen. Mother left the hospital against medical advice on the day of the birth. G.P. was discharged from the hospital on April 23, 2019 and was placed in the temporary custody

of MCCS. MCCS filed a dependency and abuse complaint. G.P. was adjudicated abused and dependent on November 1, 2019, and the court ordered her to remain in the temporary custody of MCCS.

{¶ 4} On October 21, 2020, MCCS filed a motion for permanent custody of both children. A hearing was conducted on June 10, 2021.

{¶ 5} At the hearing, the guardian ad litem (GAL) testified that he was appointed to the case in May 2020. From the time of his appointment until the hearing, the GAL had not been able to contact Mother and, thus, had not seen her with the children. The GAL testified he had visited Father's home four times, with the most recent visit being on May 28, 2021, approximately two weeks prior to the hearing. According to the GAL, Father's home was cluttered and had cords and wires lying loose around the house. The GAL also testified that the floors were loose and chipped in numerous places and that carpet strip tacks were exposed in some places. There was no mattress for the bed Father planned to use for C.P. The GAL testified that Father would not permit him to view the entire home. The GAL testified that, despite receiving instructions about how to make the home safe for the children, Father had made no progress in doing so.

{¶ 6} The GAL testified that Father had made threats of violence against the prosecutor, the magistrate originally assigned to the case, and the staff at MCCS throughout the course of the proceedings. He testified that Father had not completed treatment for his mental health issues. Further, Father continued to have contact with Mother despite her continued substance abuse.

{¶ 7} The GAL further testified that, during visitations, he had observed Father speak inappropriately to the children and threaten them with corporal punishment. The

GAL heard Father tell C.P. he wanted to, but could not, "beat" her "a**" while in the presence of the GAL and a caseworker. The GAL also testified that he had observed Father dragging C.P. by the arm during visitations. The GAL testified that the children were "familiar" with Father, but not bonded to him. Tr. p. 31. The children were doing well in foster care and were bonded to the foster family. The GAL recommended that the court award permanent custody to MCCS.

{¶ 8} Beth Pfoutz also testified at the hearing. Pfoutz had been the caseworker for the family since December 2018. According to Pfoutz, Father's case plan required him to do the following: (1) maintain clean, safe housing; (2) not allow drug use or have drug paraphernalia at the house; (3) consistently exercise visitation; (4) attend parenting classes; (5) undergo a psychiatric evaluation and follow all recommendations stemming therefrom; (6) refrain from verbal aggression and threats; and (7) sign releases for information. Pfoutz testified she made all referrals necessary for completion of the case plan.

{¶ 9} Pfoutz corroborated the GAL's testimony regarding Father's failure to maintain safe housing. Pfoutz testified that the house was dirty, cluttered, and not safe for small children. For instance, she testified that she observed a mirrored closet door that was propped up against a wall. She also testified there were cords and wires exposed in the home.

{¶ 10} Pfoutz testified that Father had not completed the psychiatric treatment requirements because he was terminated from a treatment program when he could not be contacted to schedule appointments. Pfoutz also testified that Father was not able to self-regulate and got angry and made threats of physical violence. According to Pfoutz,

Father conducted on-line research regarding all the people working on this case, including the magistrate originally assigned to the case. Father made threats toward the magistrate and her children and asked Pfoutz how she thought "certain individuals would act if he put a gun in their child's mouth and pulled the trigger." Tr. p. 117. Thereafter, the magistrate was removed from the case for her safety. Pfoutz also testified that Father was trespassed from Miami Valley Hospital due to his behavior during G.P.'s hospitalization. He also had been trespassed from Dayton Children's Hospital due to unacceptable behavior when C.P. underwent surgery to insert tubes into her ears.[1] Finally, he was trespassed from MCCS premises after making threatening statements toward staff.

{¶ 11} According to Pfoutz, two adults died from drug overdoses while in Father's home, and Mother used drugs while living in that home. Pfoutz testified that despite the requirement he not permit drug use in the home, Father continued to have a relationship with Mother. We note that Father testified at the hearing that he would not allow Mother into the home, but his testimony appeared to admit that he had not actively barred her from the home as of the date of the hearing.

{¶ 12} Pfoutz testified that Father had been consistent in attending visitation and that he had attended parenting classes. However, Father continued to act inappropriately in the presence of the children. According to Pfoutz, Father got frustrated when C.P., who, as noted, is severely autistic, did not mind him or acted out, and the more frustrated or angry Father became, the more C.P. acted out. The record supported

---

[1] Father informed the caseworker that he would have the tubes removed when C.P. was returned to his custody.

a finding that Father hit C.P. during a visitation, although he disputed this. Additionally, Pfoutz testified that she had heard Father ask C.P. why she was having a "retard fit?" Tr. p. 114. She further had heard Father intimate to the children that he was going to cause the people involved with the case to die. Pfoutz testified that she observed C.P. refer to the foster mother as "mom" during a visitation, and she then overheard Father state to C.P., "I'm gonna have to whoop [your] a** for weeks when you get home to break you of these behaviors." Pfoutz testified that Father continued to engage in this type of behavior despite being advised it was not acceptable.

{¶ 13} Further, although not a part of the case plan, Pfoutz testified that Father had no source of income. She testified that he informed her that he was employed by two federal agencies, but she had been unable to verify this claim. Father also claimed to own a food truck, but the truck was not registered and was not then being used.

{¶ 14} Finally, Pfoutz testified that she thought Father and the children were bonded. However, she also testified that the children were doing very well in their foster home and the foster parents were willing to adopt them.

{¶ 15} Father also testified at the hearing. He stated he had cleaned the house and that he planned to carpet the girls' bedroom and get a mattress for C.P. He further testified that he was preparing the food truck for use in order to generate an income.

{¶ 16} Father testified that he was "aggravated" and "mad" that C.P. had had surgery to place tubes in her ears and that she had been taken to the dentist. Father stated that, if C.P. were returned to him, he planned to take her to a "marijuana doctor" because he had read that marijuana oil would help her to verbalize. He further stated that after he sued everyone involved in taking his children out of his home, he would have

C.P. privately tutored at home. He then stated he was going to purchase a home in Canada.

{¶ 17} On cross-examination, Father admitted the water in his home had recently been shut off, but he claimed it had been turned back on. Father also denied having a criminal history. When confronted with a question regarding a conviction for aggravated menacing, he admitted the conviction but opined that he did not do anything wrong. Father further admitted that he had been required to undergo a psychiatric evaluation as part of his probation for the criminal case, but he intimated he did not cooperate because he thought the evaluator was "sticking her nose in where it didn't belong." Tr. p. 201. Father also claimed he was shot in Afghanistan during the 1980s when he was "looking for Bin Laden." Tr. p. 202. Finally, Father admitted his stepson and Mother's sister had both died in his home by overdosing on drugs.

{¶ 18} Following the hearing, the juvenile court awarded permanent custody of both children to MCCS. Both Mother and Father appeal.

## II. Analysis

{¶ 19} Although stated differently in their separate assignments of error, both Mother and Father assert that the juvenile court's decision awarding permanent custody to MCCS was not supported by the record.

{¶ 20} R.C. 2151.414(B)(1) sets forth a two-part test to be used when deciding motions seeking an award of permanent custody to a public services agency. This statute requires courts "to find, by clear and convincing evidence, that: (1) granting permanent custody of the child to the agency is in the best interest of the child; and (2)

either the child (a) cannot be placed with either parent within a reasonable period of time or should not be placed with either parent if any one of the factors in R.C. 2151.414(E) are present; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for twelve or more months of a consecutive twenty-two month period." *In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 14, citing *In re K.M.*, 8th Dist. Cuyahoga No. 98545, 2012-Ohio-6010, ¶ 8.

{¶ 21} There is no dispute the children were in the custody of MCCS for 12 or more months of a consecutive 22-month period. As a result, the only issue before us is whether awarding permanent custody to MCCS was in the best interest of the children. In this regard, "R.C. 2151.414(D) directs the trial court to consider all relevant factors when determining the best interest of the child, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable." *S.J.* at ¶ 15.

{¶ 22} We begin by noting that Mother did not seek custody of the children and does not assert on appeal that the court erred by terminating her parental rights. Instead,

Mother's entire appeal is directed to her claim that the court should have granted custody to Father. Thus, we will not address the juvenile court's best interest findings as they pertain to Mother except to note that the record supports a finding that Mother continued to use drugs, had failed to comply with her case plan, and had no interaction or relationship with the children. Indeed, the record supports the juvenile court's finding that Mother had abandoned the children. R.C. 2151.414(E)(10) and R.C. 2151.011(C).

{¶ 23} The evidence in the record supported findings that Father loved the children and had consistently exercised his visitation with them. However, both the GAL and the caseworker expressed concerns regarding Father's behavior and interactions with the children during visitation. The GAL testified that the children were not bonded to Father. While the caseworker testified that the children appeared to be bonded with him, she qualified her statement by noting that G.P. appeared comfortable around Father, but C.P. did not like to be around him when he yelled. Indeed, the caseworker testified that C.P. would cover her ears and try to comfort herself when Father shouted. The caseworker noted that Father's poor behavior often caused C.P. to act out, which, in turn, caused Father to become more agitated. Both the caseworker and the GAL testified that the children were bonded with the foster family and were doing well in that setting. The foster parents were meeting C.P.'s special needs as well as her medical needs.

{¶ 24} The wishes of the children were not ascertainable. C.P. was unable to adequately relate her wishes due to her autism and inability to verbalize. G.P., who was only two at the time of the dispositional hearing, was too young to express her wishes. The GAL made a recommendation that MCCS be awarded permanent custody of the children.

{¶ 25} At the time of the dispositional hearing, the children had been residing with the foster family for more than two years. Neither child returned to Father's home or had overnight visitation with him during that time. Thus, as stated above, the children had been in the temporary custody of MCCS for 12 or more months out of a consecutive 22-month period.

{¶ 26} The court found that the children were in need of a legally secure placement. Although Father wished to be reunified with the children and had completed some of his case plan, the court found "multiple barriers to reunification exist." Specifically, the court found that Father's home was not suitable for the children and that Father had failed to remedy the issues with the house despite having more than a year to do so. The court further found Father's interactions with the children to be problematic. The court also called into question Father's medical choices regarding C.P. The court found Father's failure to complete mental health treatment troubling, given his inability to control his behavior around the children and his use of threats toward others. Based upon these findings, the court concluded a legally secure placement could only be achieved by a grant of permanent custody to MCCS.

{¶ 27} A juvenile court's decision to terminate parental rights and to grant permanent custody to a children services agency must be supported by clear and convincing evidence. *In re L.C.*, 2d Dist. Clark No. 2010-CA-90, 2011-Ohio-2066, ¶ 14. "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v.*

*Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.   We apply an abuse-of-discretion standard, and we will not disturb a permanent custody decision "if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citation omitted.) *Id.*   The phrase "abuse of discretion" implies a decision that is unreasonable, arbitrary, or unconscionable. *In re S.S.*, 2d Dist. Miami No. 2011-CA-07, 2011-Ohio-5697, ¶ 7.

**{¶ 28}** After a review of the record in this case, we cannot say the juvenile court abused its discretion.   The record contains competent and credible evidence supporting the court's finding that the interests of the children are best served by awarding permanent custody to MCCS.   Accordingly, Mother's and Father's assignments of error are overruled.


### III.    Conclusion

**{¶ 29}** The judgments of the juvenile court are affirmed.

. . . . . . . . . . . . .

WELBAUM, J. and EPLEY, J., concur.


Copies sent to:

Mathias H. Heck, Jr.
Heather N. Ketter
J. Joshua Rizzo
Robert Alan Brenner
P.J. Conboy, II
John C. Meehling
Michael Porter
Hon. Helen C. Wallace