[Cite as *In re L.T.*, 2016-Ohio-605.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

IN RE: : 
                                  : Appellate Case No. 26922

        L.T. and A.T. :

                                  : Trial Court Case Nos. 2014-767
                                  :                     2014-772
                                  :

                                  : (Juvenile Appeal from
                                  :  Common Pleas Court)
                                  :
                                  :

. . . . . . . . . . .

O P I N I O N

Rendered on the 19th day of February, 2016.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MEAGAN D. WOODALL, Atty. Reg. No. 0093466, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45402
       Attorney for Appellee, Montgomery County Children Services

KAREN S. MILLER, Atty. Reg. No. 0071853, K.S. Miller Law Office, LLC, Post Office Box 341274, Beavercreek, Ohio 45434-1274
       Attorney for Appellant, T.T., Mother

. . . . . . . . . . . . .

HALL, J.

{¶ 1} T.T. ("Mother") appeals from the trial court's judgment entry terminating her

parental rights and awarding appellee Montgomery County Children Services ("MCCS")

permanent custody of her two children.

{¶ 2} Mother advances two assignments of error. First, she contends the trial court erred in granting the agency permanent custody where it failed to prove by clear and convincing evidence that such a disposition was in the children's best interest. Second, she claims the trial court erred in overruling her motion to strike portions of a caseworker's testimony on the basis of hearsay.

{¶ 3} The record reflects that MCCS filed a February 2014 complaint alleging that Mother's two children, born in 1999 and 2003, were dependent and neglected. The complaint and an accompanying affidavit alleged dependency and neglect due to Mother's substance abuse, instability, and failure to meet the children's basic educational needs.[1] MCCS obtained interim temporary custody. The trial court later adjudicated the children dependent and neglected and awarded MCCS full temporary custody. Thereafter, the trial court granted MCCS an extension of temporary custody. On June 26, 2015, nearly 17 months after the children first came into MCCS's care, the agency moved for permanent custody. The trial court held a September 1, 2015 hearing on the motion. The only witnesses at the hearing were MCCS caseworker Toni Penewit and the children's guardian ad litem, Mark Fisher. Based on the evidence presented, which included testimony from the two witnesses and the guardian ad litem's written report, the trial court sustained MCCS's motion, terminated parental rights, and awarded MCCS permanent custody of the children. This expedited appeal by Mother followed.

---

[1] In the proceedings below, the trial court also terminated the parental rights of the children's father, who was represented by counsel but did not appear for the hearing. The children's father did not appeal from the trial court's judgment entry. Therefore, our analysis herein will focus on Mother.

**{¶ 4}** It is well settled that a trial court's decision to grant permanent custody and to terminate parental rights must be supported by clear and convincing evidence. *In re L.C.*, 2d Dist. Clark No. 2010 CA 90, 2011-Ohio-2066, ¶ 14. We apply an abuse-of-discretion standard, and we will not disturb such a decision on evidentiary grounds "if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citation omitted). *Id.*; *see also In re S.S.*, 2d Dist. Miami No. 2011-CA-07, 2011-Ohio-5697, ¶ 7. The phrase "abuse of discretion" implies a decision that is unreasonable, arbitrary, or unconscionable. *Id.* Therefore, a trial court's decision terminating parental rights cannot be reversed based on a mere difference of opinion or substitution of our judgment for that of the lower court. *Id.*

**{¶ 5}** Having identified our standard of review, we turn now to the substantive issues before us. The standards governing permanent-custody motions are as follows:

R.C. 2151.414 establishes a two-part test for courts to apply when determining a motion for permanent custody to a public services agency. The statute requires the court to find, by clear and convincing evidence, that: (1) granting permanent custody of the child to the agency is in the best interest of the child; and (2) either the child (a) cannot be placed with either parent within a reasonable period of time or should not be placed with either parent if any one of the factors in R.C. 2151.414(E) are present; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or

more public or private children services agencies for twelve or more months of a consecutive twenty-two month period. * * *

R.C. 2151.414(D) directs the trial court to consider all relevant factors when determining the best interest of the child, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable.

*In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 14–15.

{¶ 6} Mother does not dispute whether the trial court made all of the requisite findings to award MCCS permanent custody. In her first assignment of error, however, she does dispute whether the trial court's best-interest finding is supported by clear and convincing evidence. Of relevance to that issue, MCCS caseworker Penewit testified that she developed case plans for both of the children's parents taking into consideration the concerns that led to the agency's involvement. With regard to Mother, the case plan required her to refrain from criminal activity, obtain and maintain stable housing, obtain and maintain income, sign releases and complete a drug/alcohol assessment and follow

all recommendations, and visit with the children. (Hearing Tr. at 10).

**{¶ 7}** Despite assistance from MCCS, Mother never signed any releases or participated in a drug/alcohol assessment. On one occasion, Mother went to be assessed but claimed "she didn't have time to complete the assessment, so she left." (*Id.* at 28). The assessment was important to MCCS because Mother had a history of heroin and "meth" use. She also had arrived for a visit with the children while appearing to be under the influence of drugs. (*Id.* at 11). When Penewit questioned Mother about drug use, Mother claimed she had tested positive for morphine because she had been given the drug while hospitalized. Penewit asked Mother for documentation to verify this claim but never received it. (*Id.*).

**{¶ 8}** Penewit also testified that Mother had not obtained and maintained stable housing. At the time of the hearing, Mother was residing with "a friend" at a local residence (*Id.* at 13). Penewit considered this arrangement unsuitable for the children for at least two reasons. First, Mother was residing there while still having unresolved substance-abuse issues. Second, Penewit testified that there were "a lot of individuals in and out of the home that we would need background checks on[.]" (*Id.*). Mother also had advised Penewit that she was staying at that residence "temporarily." (*Id.* at 29). According to Penewit, "there were times that [Mother] was gone for a while, and then she would come back." (*Id.*). Penewit added that Mother had not followed through on referrals to obtain her own housing through Section 8 or HUD. (*Id.* at 13).

**{¶ 9}** As for income, Penewit testified that Mother never verified any income and admitted that she did not have any employment. At the time of the hearing, Mother remained unemployed as far as Penewit knew. (*Id.* at 14). This was a concern for the

agency because it impacted Mother's ability to provide for her children. (*Id.*).

{¶ 10} With regard to visitation, Penewit explained that Mother visited the children consistently between December 2014 and March 2015. (*Id.* at 16). Prior to December 2104, Mother was "AWOL" and could not be located by the agency until being arrested on a drug charge that later was dismissed. (*Id.* at 15-16). After March 2015, the agency suspended Mother's visits because she had arrived for a visit while appearing to be under the influence of drugs. (*Id.* at 17). Penewit recalled that Mother appeared "very jittery" and was "overly talkative, overly excited." (*Id.* at 18). One of the children also reported that Mother "was rocking back and forth in her chair consistently throughout the entire visit." (*Id.*). Penewit testified that Mother's visits were suspended until she completed her drug/alcohol assessment, which she never did. (*Id.* at 17). The children also had told Penewit "that they did not want to visit with her if she continued to use substances." (*Id.* at 17, 31).

{¶ 11} With regard to the children, Penewit testified that they were residing in separate foster homes. (*Id.* at 25). One of the children was "doing great" while the other one had some behavioral issues. (*Id.* at 25-26). Although neither child had disabilities, both were in counseling to help them deal with their situations. (*Id.*). Penewit testified that she had considered placing the children with their maternal grandparents or with their paternal grandmother. The maternal grandparents expressed an inability to take the children, however, and the paternal grandmother lacked appropriate housing. (*Id.* at 26). MCCS was unable to identify anyone willing and able to care for the children. (*Id.* at 27). Based on both parents' failure to complete their case plans and the lack of anyone else available to care for the children, Penewit stated that she believed an award of permanent

custody to MCCS was in their best interest. (*Id.*). In reaching this conclusion, Penewit opined that neither parent had made any progress on the case plans despite the children having been in the agency's care since February 2014. (*Id.* at 38-39).

{¶ 12} The only other witness at the hearing was Mark Fisher, the children's guardian ad litem. He testified that neither parent had much contact with him and, in his opinion, they had "made no progress on their case plan." (*Id.* at 41). His primary concerns were "the length [of time] that the children have been in [agency] care, the fact that we don't know [the parents'] sobriety, and stable income and housing." (*Id.*). Consistent with his written report, Fisher recommended that MCCS receive permanent custody of both children. (*Id.* at 44-45). In his written report, Fisher noted that the older child wanted to see Mother if Mother "could remain sober." (Doc. #5 at 2). But that child also "was not opposed to the current [permanent] custody motion given her understanding of her parents' sobriety and case plan requirements." (*Id.* at 2-3). The older child was in foster care but not a foster-to-adopt home. (*Id.*) According to Fisher's report, the younger child was "doing very well" in her foster home, which was a foster-to-adopt placement. (*Id.* at 3). The younger child did "not want to see either of her parents due to their drug usage." (*Id.*). She wanted MCCS to obtain permanent custody so her current foster family could adopt her, as they hoped and planned to do. (*Id.*).

{¶ 13} In its decision, the trial court found, among other things, that Mother remained unemployed and had no source of income, that Mother lacked stable, appropriate and permanent housing, and that Mother had not completed substance-abuse treatment. (Doc. #2 at 1). The trial court further found that neither parent had completed the case plan, that no one had been identified who was willing and able to care

for the children, and that there was a reasonable expectation for adoption. (*Id.* at 2). In accordance with R.C. 2151.414(D), the trial court found by clear and convincing evidence that awarding permanent custody to MCCS was in the children's best interest. (*Id.*).

{¶ 14} On appeal, Mother argues that she was "bonded" with her children and that MCCS interfered with this bond by suspending her visitation. Mother also suggests that suspending her visitation impacted the children's wishes about the termination of her parental rights. With regard to housing, Mother claims it is "unclear" what the agency found inappropriate about her living arrangement. Mother also asserts that she would qualify for food stamps and other government assistance if the children were returned to her. Mother additionally argues that Penewit failed to specify why the paternal grandmother's home was inappropriate for the children or to state whether a home study had been done. Mother also notes that Penewit provided no testimony about the foster parents' desire to adopt the younger child. She notes too that the older child was not in a foster-to-adopt placement and that no plan apparently was in place for the children to maintain a relationship. Finally, Mother argues that a second extension of temporary custody could have been granted instead of awarding MCCS permanent custody. (Appellant's brief at 11-13).

{¶ 15} Upon review, we find Mother's arguments unpersuasive. The record contains little evidence of a strong bond between Mother and the children, even before her visitation was suspended in March 2015. As set forth above, the children were placed in the agency's care in February 2014. Mother did not start visiting them until December 2014. She subsequently appeared for a visit while under the apparent influence of drugs, and the children expressed a desire not to see her in that condition. (Hearing Tr. at 17,

31; *see also* Doc. #5 at 2-3). Both children later agreed that MCCS should obtain permanent custody because neither parent could refrain from using drugs. (Doc. #5 at 3). With regard to Mother's housing, the trial court reasonably had concerns, particularly in light of her statement to Penewit that her living arrangement was "temporary" and based on the fact that Mother would leave for periods of time and stay elsewhere. At a minimum, the record reflects a lack of stability regarding housing. With regard to finances, the trial court properly considered Mother's failure to obtain employment and her lack of income. The fact that she might be eligible for government assistance did not make her lack of employment irrelevant. As for the inappropriateness of the paternal grandmother's home for the children, Mother's attorney could have cross examined Penewit on that issue if she believed additional details were necessary. With regard to adoption, it is true that Penewit did not testify about the foster parents' desire to adopt the younger child. The guardian ad litem's report did address that issue, however, and Mother's counsel could have cross examined him. It also is true that the older child is not in a foster-to-adopt placement and that MCCS did not present any testimony about a plan to keep the children in touch with each other. Although these are relevant facts, they certainly did not preclude awarding permanent custody to MCCS. Finally, MCCS was not required to seek a second extension of temporary custody in lieu of moving for permanent custody where the evidence supported an award of permanent custody. *See, e.g.*, R.C. 2151.415(D)(2) (recognizing that after receiving a first extension of temporary custody an agency may move for permanent custody). In short, having reviewed the record, we see no abuse of discretion in the trial court's best-interest determination or in its award of permanent custody to MCCS. We conclude that the trial court's decision is supported by clear and

convincing evidence. The first assignment of error is overruled.

{¶ 16} In her second assignment of error, Mother claims the trial court erred in overruling her motion to strike portions of Penewit's testimony on the basis of hearsay. On direct examination, Penewit testified about Mother having tested positive for various controlled substances in February or March 2015. (*See*, *e.g*, Hearing Tr. at 11). On cross examination, Mother's counsel questioned Penewit as follows:

Q. Let's go back to the drug screen that you were talking about that mother took in the end of February, beginning of March 2015. Were you provided with a copy of those drug screen results?

A. I believe so.

Q. Okay. Have you reviewed your case activity notes before coming to testify today?

A. Not recently, no.

Q. Okay. Would it be – refresh your recollection if your case activity notes said that you spoke with the juvenile probation officer about the results of the FCAP performed on mother?

A. Yes, initially I did speak with probation.

Q. Okay. And did you actually, then, receive a hard copy of those results?

A. I believe I did. We normally do. But I can't – I can't say for sure at this point.

(Hearing Tr. at 33).

{¶ 17} Mother's counsel "move[ed] to strike this caseworker's testimony and

previous testimony regarding mother's drug screen performed this year because she cannot verify that she has seen the actual copy of that at this point in time." (*Id.* at 34). Mother's counsel argued that if Penewit had not seen an actual copy of the results, then her testimony about them was hearsay. (*Id.*). The trial court overruled the objection without explanation. (*Id.*).

{¶ 18} Upon review, we believe Penewit's testimony actually supports a finding that she *did* see the test results. When directly asked that question twice, she responded, "I believe so" and "I believe I did." That fact that Penewit could not be absolutely "sure" fails to establish that she did not see the results. We need not dwell on that issue, however, because even if Penewit saw an actual copy of the results, her testimony about them remained hearsay. *See In re E.B.*, 2d Dist. Greene Nos. 2011 CA 13, 2011 CA 14, 2012-Ohio-2231, ¶ 27.

{¶ 19} In any event, we agree with MCCS that the admission of hearsay testimony about the test results was harmless error. This is so because the record contains ample other evidence about Mother's history of drug use and her continued drug use during the relevant time period. The record reflects that Mother was an active heroin user when MCCS became involved in the case. (*See* Affidavit accompanying Doc. #32). When awarding MCCS temporary custody, the trial court found, following a hearing, that Mother had "a history of substance abuse." (Doc. #26 at 1). In addition, the guardian ad litem's report, which Mother did not challenge on hearsay grounds, referred to the younger child mentioning Mother's drug usage and stating that the "last time she saw her mother, that her mother was not in her right state of mind." (Doc. #5 at 3). Penewit also testified that she was present and observed Mother when she appeared for a visit while under the

apparent influence of drugs. (Hearing Tr. at 11, 31). Because the drug test at issue occurred *after* that visit, it should be no surprise that Mother apparently failed it. (*Id.* at 11). We note too that Mother admitted having taken morphine and failed to provide any documentation that it had been medically prescribed. (*Id.* at 11-12). Based on all of the evidence admitted at the permanent-custody hearing—including other evidence of Mother's drug usage, her failure to complete a drug assessment, and her multiple shortcomings with regard to her case plan—we agree with MCCS that Penewit's hearsay testimony about the specific drug-test results was harmless. *Compare In re E.B.* at ¶ 27 ("Based on all of the evidence presented at the February 1 hearing concerning E.B., we agree with CSB that any hearsay evidence regarding Iva's drug screen results was harmless. Even without the results, there was substantial evidence that Iva had been abusing drugs for many years and had not yet successfully completed drug treatment."). Accordingly, Mother's second assignment of error is overruled.

{¶ 20} The judgment of the Montgomery County Common Pleas Court, Juvenile Division, is affirmed.

. . . . . . . . . . . .

DONOVAN, P.J., and FROELICH, J., concur.

Copies mailed to:

Mathias H. Heck, Jr.
Meagan D. Woodall
Karen S. Miller
Charles Claypool
Mark Fisher
Hon. Nick Kuntz