[Cite as *In re K.A.W.*, 2022-Ohio-3254.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

| | | |
|---|---|---|
| IN RE: K.A.W. and T.A.W. | : | |
| | : | |
| | : | Appellate Case Nos. 2022-CA-32 and 2022-CA-33 |
| | : | |
| | : | |
| | : | Trial Court Case Nos. 2020-C-00071-0C and 2020-C-00072-0C |
| | : | |
| | : | |
| | : | (Appeal from Common Pleas Court- Juvenile Division) |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 16th day of September, 2022.

. . . . . . . . . . .

MEGAN A. HAMMOND, Atty. Reg. No. 0097714, Assistant Prosecuting Attorney, Greene County Prosecutor's Office, 61 Greene Street, Suite 200, Xenia, Ohio 45385
      Attorney for Appellee, Greene County Children Services Board

ROBERT ALAN BRENNER, Atty. Reg. No. 0067714, P.O. Box 340214, Dayton, Ohio 45434
      Attorney for Appellant, Mother

KELLY M. SCHROEDER, Atty. Reg. No. 0080637, 1 South Main Street, Suite 1800, Dayton, Ohio 45402
      Attorney for Appellant, Father

. . . . . . . . . . . . .

TUCKER, P.J.

{¶ 1} Mother and Father appeal from a judgment of the Greene County Court of Common Pleas, Juvenile Division, which awarded permanent custody of their two minor to the Greene County Children Services (GCCS). Because we find no error in the trial court's decision, the judgment is affirmed.

## I. Facts and Procedural History

{¶ 2} Mother and Father are the biological parents of K.A.W. and T.A.W. who were born in March 2020. At birth, both children tested positive for amphetamines and were hospitalized, and a referral was made to GCCS. K.A.W. was released from the hospital on April 9, 2020, and T.A.W. was released on April 22, 2020. Upon discharge from the hospital, the children were placed with Brigid's Path, where they received medically-supervised withdrawal care. GCCS filed a dependency complaint on May 14, 2020.

{¶ 3} A case plan was implemented on June 12, 2020. The plan required Mother to undergo alcohol and drug treatment as well as mental health treatment. Both parents were required to take parenting classes and submit to random drug screenings.

{¶ 4} On June 17, 2020, the children were adjudicated dependent. They were discharged from Brigid's Path and placed in foster care on June 30, 2020.

{¶ 5} On July 16 and July 23, 2020, both parents tested positive for drugs. A disposition hearing was conducted on July 29, 2020. Despite proper notification, neither parent appeared for the hearing. Following the hearing, the court awarded temporary custody of the children to GCCS. On November 5, 2020, both parents took part in a

semi-annual review.   Following a drug screen conducted in October 2020, Mother tested positive for drugs; Father was negative.

**{¶ 6}** Mother was arrested on January 29, 2021, for two felonies and was placed on intervention in lieu of conviction (ILC).   Mother had two negative drug tests in March 2021.

**{¶ 7}** In April 2021, a first extension of temporary custody was entered.   The case plan was amended in August 2021.   The plan added a requirement that Mother comply with the terms of her ILC.   The plan further required both parents to comply with a visitation schedule and to keep GCCS updated on their current contact information. Additionally, the plan added requirements for Father to undergo mental health, drug, and alcohol assessments and to follow through with any recommended treatment.   On September 29, 2021, both parents had a positive drug screen.

**{¶ 8}** In October 2021, a second extension of temporary custody was granted to GCCS.   Additionally, the case plan was amended to require both parents to obtain stable housing and employment.   Father was also required to attend domestic violence classes. Father had a positive drug screen in December 2021.

**{¶ 9}** GCCS filed a motion for permanent custody on January 20, 2022.   In February 2022, Mother was arrested for failing to report to her ILC officer.   Following a hearing, she was continued on ILC.   Father also had a positive drug screen in February 2022.

**{¶ 10}** A hearing on permanent custody was set for March 22, 2022.   However, counsel for Mother informed the court that Mother had not been properly notified of the

hearing, and the court rescheduled it. Mother was properly served with notice of the rescheduled date. Father had been arrested at the courthouse on an outstanding warrant, and he was served with notice of the rescheduled hearing in the Greene County Jail.

{¶ 11} A hearing was conducted on April 22, 2022. The trial court then awarded permanent custody of the children to GCCS. Mother and Father appeal.

## II. Father's Constitutional Arguments

{¶ 12} Father's first assignment of error provides as follows:

THE TRIAL COURT'S DECISION GRANTING PERMANENT CUSTODY TO THE AGENCY SHOULD BE REVERSED BECAUSE THE AGENCY VIOLATED FATHER'S CONSTITUTIONAL RIGHTS.

{¶ 13} Father contends GCCS violated his equal protection and due process rights.

{¶ 14} We first address the issue of due process of law. "The right to parent one's children is a fundamental right." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 28, citing *Troxel v. Granville*, 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997). This fundamental right is protected by the due process clause of the Fourteenth Amendment to the United States Constitution and by Section 16, Article I of the Ohio Constitution. *In re Hockstok*, 98 Ohio St.3d 238, 2002-Ohio-7208, 781 N.E.2d 971, ¶ 16. "The fundamental requisites of due process of law in any proceeding are notice and the opportunity to be heard." *In*

*re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 17, citing *Armstrong v. Manzo*, 380 U.S. 545, 550, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965), quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

{¶ 15} The only issue we can discern regarding the denial of due process is Father's claim that GCCS failed to notify him that the agency was seeking permanent custody of the children. We find this claim lacking in merit.

{¶ 16} The record indicates that the GCCS caseworker had multiple conversations with both parents informing them that failure to comply with the case plans would lead the agency to seek an award of permanent custody. The caseworker also informed the parents of the timeframe for extending temporary custody and seeking permanent custody. Most importantly, it is clear from the record that Father was afforded ample notice of the permanent custody hearing, which he attended with counsel. In sum, we find nothing in this record to support a finding that Father was denied his right to due process of law.

{¶ 17} Father next claims he was denied equal protection because GCCS did not treat him and Mother equally. In support, he cites *Sessions v. Morales-Santana*, __ U.S. __, 137 S.Ct. 1678, 198 L.Ed.2d 150 (2017), for the proposition that "different treatment of fathers and mothers discriminates based on sex and violates the equal protection guarantee of the U.S. Constitution and Ohio Constitution." We have reviewed *Sessions* and conclude it has no bearing on this case as it involved gender-based federal statutory distinctions between mothers and fathers in relation to their ability to pass their United States citizenship status to their children. Here, Father has not alleged or demonstrated

any gender-based statutory distinctions.

{¶ 18} Instead, Father's complaint is based upon what he deems to be numerous failures by GCCS to treat him the same as Mother. He contends the agency failed to obtain contact information from him and failed to communicate with him. He also specifically refers to a meeting to discuss the case plan objectives, which he claims the agency held with Mother without including him.

{¶ 19} A review of the record indicates that the current caseworker, who started working on the case in May 2020, did not seek contact information for Father because he was living with Mother while the children were at Brigid's Path. However, the caseworker testified that contact information would have been gathered by the initial caseworker, and that relevant information was subsequently obtained from Father. The caseworker testified that over the course of this case, Father lived in at least six homes and had more than five phone numbers and three e-mail accounts. She testified that, in addition to calling Father and sending letters to his various residences, she would also send him e-mails. However, she indicated there were times she was unable to contact him because of the changes in his contact information, and that this situation continued even after the case plan was amended to require the parents to keep the agency informed of their updated contact information. With regard to the meeting to discuss the case plan, the record sufficiently demonstrates that the caseworker informed Father of the meeting.

{¶ 20} Father next claims that he was treated differently from Mother because the caseworker failed to inform him that he could reside at Brigid's Path with the children. Additionally, he claims GCCS conducted a home study for him, which was

"discriminatory" because GCCS did not "require the same for mothers."

**{¶ 21}** There is nothing in this record to indicate that the caseworker informed either parent they could reside with the children at Brigid's Path.   And the record shows the home study was conducted on a residence in which the parents were living together. The record does not support a finding of differential treatment.

**{¶ 22}** Finally, Father claims GCCS asked Mother, but failed to ask him, about any relatives with whom the children could be placed.   There is evidence that Father was not initially asked about relatives with whom to place the child.   However, the record indicates that Father was asked about this multiple times during the pendency of the case, and he did not present GCCS with any potential placements.   Thus, we find no merit in this claim.

**{¶ 23}** Finally, Father appears to argue that his rights were violated because GCCS did not release the children to his care following their stay at Brigid's Path.   He correctly notes that GCCS was initially more concerned with Mother's behavior than with his.   He also claims that GCCS had no issue with his parenting at the point it placed the children with the foster parents.   This, however, is a misstatement of the record.   Father was released from incarceration for domestic violence just one month before the birth of the children.   The caseworker indicated that during the pendency of the case that GCCS received reports of domestic violence between Father and Mother in which Father was alleged to be the aggressor.   The parents lived with each other for the majority of the pendency of this case.   Further, while the children were at Brigid's Path, the parents were observed fighting at the facility.   The concern about domestic violence issues led, in part,

to the agency's decision to place the children in foster care rather than with Father. We cannot discern how, under these facts, Father was deprived of his equal protection or due process rights.

{¶ 24} Father has failed to establish that the actions of the agency resulted in a denial of his constitutional rights. Accordingly, Father's first assignment of error is overruled.

### III. Permanent Custody Determination

{¶ 25} The sole assignment of error asserted by Mother and the second assignment of error asserted by Father state, respectively, as follows:

THE JUVENILE COURT ERRED WHEN IT GRANTED PERMANENT CUSTODY OF THE CHILDREN TO GCCS.

THE TRIAL COURT'S DECISION GRANTING PERMANENT CUSTODY TO THE AGENCY WAS NOT IN THE CHILDREN'S BEST INTEREST.

{¶ 26} Both parents claim the record does not support the trial court's finding that an award of custody to GCCS was in the best interest of the children.

{¶ 27} Relevant to this case, R.C. 2151.414, authorizes a juvenile court to award permanent custody to a children services agency when it finds by clear and convincing evidence that (1) granting permanent custody to the agency is in the best interest of the child and (2) the child has been in the temporary custody of the agency for 12 or more months of a consecutive 22-month period. R.C. 2151.414(B)(1)((d). "Clear and

convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases," and which will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 28} Here, the trial court made the findings required to award GCCS permanent custody. Among other things, it found by clear and convincing evidence that the children had been in GCCS's temporary custody for more than 12 months of a consecutive 22-month period and that an award of permanent custody to GCCS was in the children's best interest. On appeal, neither Mother nor Father disputes that the children had been in the temporary custody of GCCS for the requisite time. Instead, both Mother and Father contest the whether the trial court's best-interest finding was supported by clear and convincing evidence.

{¶ 29} The best-interest analysis, as set forth in R.C. 2151.414(D), directs the trial court to consider all relevant factors, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for 12 or more months of a consecutive 22-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C.

2151.414(E)(7) through (11) are applicable.

{¶ 30} The record shows that the children were bonded with their foster parents and foster sibling. The foster parents had expressed a desire to adopt both of the children. The children were doing well, were meeting all developmental milestones, and the foster parents were meeting T.A.W.'s medical needs.[1]

{¶ 31} Conversely, the children had never lived with Mother or Father and there was no evidence that they were bonded to their biological parents. While early visitations went well, the record demonstrates that the parents were sporadic in attending and that they did not exercise all their permitted visitations. Additionally, neither parent exercised visitation after September 2, 2021. The children had never met Mother's other five children, nor had they met Father's other child. There were no other relatives with whom the children had a relationship.

{¶ 32} While the children were too young to express their wishes, the guardian ad litem recommended an award of permanent custody to GCCS.

{¶ 33} The children had been in the care of GCCS since their birth. At the time of the permanent custody hearing, they had lived with the same foster family for approximately 18 months. Also, at the time of the hearing, Mother had started a six-month lockdown treatment program in order to comply with her probation, and Father had not demonstrated that he was able to provide stable housing for the children. Both parents had tested positive for drugs during the pendency of the case, and they had not completed their respective case plans.

---

[1] T.A.W. has a heart condition which required medication and also required the foster parents to listen to his heart beat daily.

{¶ 34} Based on this evidence, the juvenile court concluded that the best interest of the children required a termination of parental rights and an award of permanent custody to GCCS.

{¶ 35} A trial court's decision to grant permanent custody to the State and terminate parental rights must be supported by clear and convincing evidence. *In re L.C.*, 2d Dist. Clark No. 2010-CA-90, 2011-Ohio-2066, ¶ 14. We apply an abuse-of-discretion standard, and we will not disturb the trial court's judgment on evidentiary grounds "if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citation omitted.) *Id.*; *see also In re S.S.,* 2d Dist. Miami No. 2011-CA-07, 2011-Ohio-5697, ¶ 7. The phrase "abuse of discretion" implies a decision that is unreasonable, arbitrary, or unconscionable. *S.S.* at ¶ 7.

{¶ 36} On this record, the juvenile court did not err in terminating Mother's and Father's parental rights and awarding permanent custody to GCCS; there was clear and convincing evidence that the children had been in the temporary custody of GCCS for more than 12 months of a consecutive 22-month period and that an award of permanent custody was in the children's best interest. Thus, we find no abuse of discretion and have no basis to reverse the decision of the juvenile court.

{¶ 37} Accordingly, Mother's sole assignment of error and Father's second assignment of error are overruled.

## IV. Conclusion

**{¶ 38}** The assignments of error are overruled.

**{¶ 39}** The judgment of the juvenile court is affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and WELBAUM, J., concur.

Copies sent to:

Megan A. Hammond
Robert Alan Brenner
Kelly M. Schroeder
Jan Stewart, CASA
Hon. Amy H. Lewis